# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSCHUSETTS

| | |
|---|---|
| JOSUE JOSEPH, individually and on behalf of all others similarly situated, | Case No. 1:24-cv-11579-MJJ |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| IGN ENTERTAINMENT, INC., | Hon. Myong J. Joun |
| Defendant. | |

Dated: November 22, 2024

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*Pro Hac Vice Forthcoming*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice Forthcoming*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: ykopel@bursor.com
        mroberts@bursor.com
        vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr. (BBO # 566161)
45 South Main Street, 3rd Floor
West Hartford, CT  06107
Telephone: (860) 955-9455
Facsimile:  (860) 920-5242
Email:  james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ................................................................... 1

FACTUAL BACKGROUND .................................................................. 1

    I.      History And Overview Of The VPPA ..................................... 1

    II.    Defendant Is A Video Tape Service Provider And Website Account Holders Are Consumers ............................................................................ 2

    III.   Defendant Knowingly Discloses Its Users' Personally Identifiable Information With A Third Party ..................................................... 6

        A.    Testing Reveals That Defendant Illegally Shares Users' PII With Piano ............................................................ 6

        B.    Defendant Discloses Users' E-mail Addresses And User IDs To Piano ............................................................. 8

        C.    Defendant Discloses To Piano Information Identifying Which Specific Videos Were Watched By Which Users ....................... 10

    IV.   Defendant Discloses Personally Identifiable Information To Piano For The Purposes Of Marketing, Advertising, And Analytics .......................... 11

    V.    Defendant Knowingly Discloses Users' Personally Identifiable Information To Piano ............................................................................ 17

    VI.   Plaintiff's Experience ...................................................... 18

THE PARTIES ........................................................................... 19

JURISDICTION AND VENUE .......................................................... 20

CLASS ALLEGATIONS ................................................................. 21

CAUSE OF ACTION .................................................................... 24

JURY DEMAND ......................................................................... 26

Plaintiff Josue Joseph ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This is a class action suit brought against Defendant IGN Entertainment ("IGN" or "Defendant") for violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2.    Defendant owns and operates a website entitled ign.com (the "Website" or "ign.com"), which provides reviews of and news about video games, television shows, comics, movies, and technology.[1]  Many of Defendant's articles include pre-recorded videos.[2]

3.    Unbeknownst to Plaintiff and members of the Class, Defendant discloses the titles and URLs of the videos that Plaintiff and Class Members view on Defendant's platform, along with consumers' email addresses and user IDs, to piano.io ("Piano"), an unrelated third party.

4.    Plaintiff bring this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA.

## FACTUAL BACKGROUND

### I.    HISTORY AND OVERVIEW OF THE VPPA

5.    The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  Congress responded by passing the VPPA, with an eye toward the digital

---

[1] IGN, ign.com.

[2] *Id.*

future.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (cleaned up).

6.      In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones."  S. Rep. 112-258, at 2.

7.      The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

## II.    DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER AND WEBSITE ACCOUNT HOLDERS ARE CONSUMERS

8.      Defendant develops, owns, and operates IGN.com.  As Defendant describes itself:

> IGN Entertainment is one of the leading Internet media companies focused on video games and entertainment. IGN reaches more than 288 million monthly users around the world, and is followed by more than 51MM social and YouTube followers. With an extremely engaged audience, watching over

566MM minutes of content monthly. IGN also publishes daily content on 34 platforms including TikTok, Twitter, Facebook, Instagram and Snapchat Discover.  Established in 1996, IGN is headquartered in Los Angeles, with offices in San Francisco, New York, Chicago, Sydney, and London.[3]

9.      Users can access the Website via their web browsers, including the web browser Chrome.  Defendant now "reaches 490 million monthly users around the world."[4]

10.      Users can access the Website to view videos such as game previews, movie trailers, and television show clips that accompany articles posted on the Website.[5]

11.      Defendant also prominently informs users that it provides pre-recorded video content, including through a "Video" option on its Website's main menu:



---

[3] Six Flags Fiesta Texas Partners With IGN Entertainment to Launch ESIX Gaming, the World's First-Ever Theme Park Based Gaming Experience (May 17, 2023), https://corp.ign.com/press#.

[4] LinkedIn: IGN Entertainment, https://www.linkedin.com/company/ign-entertainment/.

[5] Id.

12.    Upon clicking the "Video" category on Defendant's Website, users can view an assortment of pre-recorded videos, including original shows, trailers, and gameplay videos (for video games):



13.    Users have the option to create a Website account.  Creating an account is not free of commitment, however.   Instead, users are required to provide their personally identifiable information (their e-mail address) to Defendant in exchange for these benefits.  Once users create an account, and as alleged in more detail below, Defendant also assigns a user ID to these account holders so as to track them.

14.    Further, providing an e-mail address to Defendant is what allows Defendant to ultimately disclose the e-mail address to Piano for marketing, advertising, and data analytics—activities that naturally generate revenue for Defendant.  In other words, Defendant would not be able to make money off of Plaintiff's PII had the PII not been provided to Defendant in the first place, and Defendant only receives the PII by virtue of Plaintiff creating a Website account.

15.    The disclosure of PII provided by Website account holders for advertising purposes is of crucial importance to Defendant.  That is because Defendant is able to provide content to its

extensive viewership for free, in part, because of the revenue it derives from advertisements.[6] Notably, Defendant provides detailed guidelines on the appropriate format and specifications for advertisements to be placed on its Website.[7]

16.    As Piano, the third party to whom Defendant discloses PII to, recognizes:

> [c]apturing [user] data requires the right incentives and value exchange—after all, users need a reason to share an email address, register or volunteer demographic and interest data. That requires more than just putting up a registration wall … [because] most publishers can't afford the negative impact on audience and pageviews from a hard registration requirement like that. Creating incentives beyond just access can increase the number of users who register without reducing audience.[8]

17.    In other words, because Defendant relies so heavily on PII for advertising revenue, it needs to provide incentives beyond simply accessing content to prompt users to fork over their PII. So, when a user creates a Website account (and thereby provides their e-mail address to Defendant), Defendant provides users with "the ability to use a lot of services that you may not have even know existed on IGN," including but not limited to: (i) "[e]ntry into contests and offers"; (ii) "[f]ree game and music magazines"; (iii) "[a]ccess to IGN.com message boards"; (iv) "[t]ext and voice IGN.com chat"; (v) a "[p]ersonalized My.IGN start page"; (vi) "[c]ustomized gaming newsletters"; and (vii) a "[f]ree IGN.com e-mail address."[9]

---

[6] *See, e.g.*, IGN, AD SPECS & GUIDELINES, https://specs.ign.com/. Defendant provides this as a link on its Website, demonstrating how important advertisements are to Defendant's business structure.

[7] *See id.*; *see also* IGN, ADVERTISING POLICIES, https://specs.ign.com/advertising-policies.

[8] INTRODUCING PIANO ZERO: HOW PIANO MEETS PUBLISHER NEEDS IN THE COOKIELESS ERA, https://resources.piano.io/resources/introducing-piano-zero-how-piano-meets-publisher-needs-in-the-cookieless-era/

[9] BECOME AN IGN MEMBER TODAY, https://www.ign.com/articles/2001/03/09/become-an-ign-member-today-2.

III.    **DEFENDANT KNOWINGLY DISCLOSES ITS USERS' PERSONALLY IDENTIFIABLE INFORMATION WITH A THIRD PARTY**

A.    **Testing Reveals That Defendant Illegally Shares Users' PII With Piano**

18.    In early 2024, Plaintiff's counsel retained a private research company to conduct a dynamic analysis of the Website. A "dynamic analysis" records the transmissions that occur from a user's device. The researchers analyzed the disclosures made from the Website to third parties when watching a video.

19.    The analysis establishes that Defendant integrates at least one "application programming interface" ("API") into the Website: the Piano API, either as part of a Piano Software Development Kit ("SDK") or as a standalone API.

20.    An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[10] An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[11]

21.    An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[12]

---

[10] IBM, *What is an API?*, available https://www.ibm.com/topics/api.

[11] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

[12] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

22.     Piano is a "revenue solutions" company that provides products and services including metered paywalls, analytics, personalization, and monetization.

23.     "Piano's Digital Experience Platform empowers organizations to understand and influence customer behavior.  By unifying customer data, analyzing behavior metrics and creating personalized customer journeys, Piano helps brands launch campaigns and products faster, strengthen customer engagement and drive personalization at scale from a single platform."[13]



24.     In 2015, Piano merged with TinyPass.[14]  The merge "reflect[ed] a global move by media businesses" demonstrating "the need for comprehensive monetization, intelligence and analytics tools."[15]

25.     Piano offers content companies like Defendants solutions to "[d]iscover your audience[, and b]uild a better experience," as well as "[s]trategic [s]ervices" to "[k]now your audience."[16]

---

[13] https://www.linkedin.com/company/piano-io/about/

[14] PIANO MEDIA AND TINYPASS MERGE, PRESS RELEASE (Aug. 11, 2015), https://piano.io/media/Piano_Press_release.pdf.

[15] *Id.*

[16] PIANO, https://piano.io/.



26.    These services, in turn, allow Piano's customers such as Defendant to analyze Website user data and provide targeted advertisements.

27.    The dynamic analysis found that when a user creates an account on the Website and watches a pre-recorded video on the Website, Defendant discloses the following information to Piano:

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| Piano.io | Video Name, URL | Email | User ID |

28.    The aforementioned disclosures to Piano are believed to have occurred throughout the entire class period.

**B.    Defendant Discloses Users' E-mail Addresses And User IDs To Piano**

29.    An e-mail address is a unique string of characters that designates an electronic mailbox. As industry leaders,[17] trade groups,[18] and courts[19] agree, an ordinary person can use an

---

[17] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[18] Network Advertising Initiative, NAI CODE OF CONDUCT 19 (2020), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[19] *See United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

email address to uniquely identify another individual. Indeed, there exists multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address.

30.    The dynamic analysis found that when a user watches a video, Defendant discloses to Piano a user's e-mail address.

31.    Defendant discloses users' e-mail addresses in an encrypted format (Base64), resulting in what Defendant calls a "user_token." The following excerpt from the dynamic analysis shows a disclosed "user_token" that contains a users' "encrypted" e-mail address:

user_token:
eyJhbGciOiJFUzI1NiIsInR5cCI6IkpXVCJ9.eyJhdWQiOiJodHRwczovL3BpYW5vLmlvIiwidWlkIjoiMmM2NDlkZDMtZDRhZC00YjdjLTk2ZDItZDA5M2E2Y2U1NjU1IiwiZW1h
aWwiOiJwZXBweW1heUB5YWhvby5jb20iLCJmaXJzdE5hbWUiOiIiLCJsYXN0TmFtZSI6IiIsImlhdCI6MTcxMDg2MjI3MywiZXhwIjoxNzEzNDU0MjczLCJpc3MiOiJodHRwczovL
2lnbi5jb20ifQ.LqwO152HdW7kFHE2RauPF_dVfnZq_o3GLcPw1ZaqadkGsOOoXz_T4n9Un2_EnIoNYf6Qtaq-bbLToJl5n2-OnA

32.    However, even an ordinary person can easily decrypt something encrypted in Base64. Indeed, Multiple free online resources exist to allow anyone with access to the Internet to decode Base 64-encrypted text into legible text. For example, the following screenshot depicts one such free online resource:[20]



---

[20] BASE64 DECODE, https://www.base64decode.org/.

33.     The top box in the screenshot above, titled "Decode from Base64 format," has been filled with the "user_token" text—which is the Base64-encrypted field Defendant transmitted to Piano.  The bottom box in the screenshot above, labelled "<Decode>", is populated with legible text that the tool decrypted.

34.     Notably, the user's e-mail address is clearly displayed in the decrypted text populated inside the bottom box.

35.     In addition, Defendant also discloses a user's unique user ID, which Defendant calls a "uid," to Piano.  The user's "uid" is a unique string of letters, numbers, and hyphens that helps Defendant and Piano identify a specific user.  In the above decrypted "user_token", the disclosed user ID is "2c649dd3-d4ad-4b7c-96d2-d093a6ce5655."

**C.      Defendant Discloses To Piano Information Identifying Which Specific Videos Were Watched By Which Users**

36.     Defendant discloses to Piano the full title of a video that a user watches and the Universal Resource Locator ("URL") for that video.  For example, in the excerpted dynamic analysis below, the disclosed video's title is "How X-Men: The Animated Series Reshaped the Franchise – IGN:"



```
pageTitle: How X-Men: The Animated Series Reshaped the Franchise - IGN
url: https://www.ign.com/videos/how-x-men-the-animated-series-reshaped-the-franchise
referrerUrl: https://www.ign.com/
contentType: video.other
```

37.     A video's title is the most basic identifier of that video and necessarily discloses the name of the video watched by the user.

38.     In addition, a video's URL takes anyone who enters that URL into an Internet search browser directly to the webpage containing the video.  The following screenshot shows the disclosed URL entered into a web browser, which shows the video watched by the user:



39.    The dynamic analysis also found that Defendant discloses to Piano that a user actually watched the video as opposed to simply reading an article.  Specifically, a field called "content_type" is sent to Piano.  When a user views a video, the field is filled is as "video.other," which indicates a video was actually watched:



## IV.    DEFENDANT DISCLOSES PERSONALLY IDENTIFIABLE INFORMATION TO PIANO FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS

40.    Defendant transmits a user's e-mail address, user ID, video name, and video URL to Piano so that Piano can analyze user behavior.  Through Piano's analysis results, Defendant is able to target different users with different marketing and advertising strategies, and thereby increasing its user base.

41.     Piano is a digital advertising and analytics platform that empowers its customers like Defendant to "create customized digital experiences and build commercial relationships with [their] users – fueling [their customers'] subscription, conversion, analytics, entitlement[,] and personalization goals."[21]

42.     Piano's senior advisor and Board member, Kelly Leach, stated that "[a]udience intelligence and optimization are critical elements of content monetization. By [the Piano and Tinypass merge] … the combined company is able to offer media companies the most comprehensive, effective[,] and user-friendly platform in the industry."[22]

43.     Piano's suite of technological tools provides services to customers like Defendant that "[f]uel the commerce side of your digital business;"[23] "[a]mplify your brand impact" "through … curation, audience personalization, targeting, and email delivery";[24] and "[i]dentify a user cohort, target them with a personalized experience, and report on the results, all in real-time,"[25] among other marketing, analytics, and advertising initiatives.

44.     One example of a tool Piano offers its customers, like Defendant, is the "Piano VX."[26]  VX "is [Piano's] most powerful commerce engine that creates real-time value."[27]  This tool delivers "[t]he numbers [Defendant] need[s]" to improve its marketing, analytics, and

---

[21] THE PIANO PLATFORM AND SERVICES, PIANO, https://piano.io/de.

[22] PIANO MEDIA AND TINYPASS MERGE, PRESS RELEASE (Aug. 11, 2015), https://piano.io/media/Piano_Press_release.pdf.

[23] ANALYTICS + ACTIVATION, https://resources.piano.io/.

[24] PIANO ESP, https://piano.io/de/product/esp/.

[25] PIANO, https://piano.io/.

[26] PIANO VX, PIANO, https://piano.io/de/product/vx/.

[27] *Id.*

advertising capabilities," such as by "[c]aptur[ing] first-party data and profiles" and "[p]ersonaliz[ing] emails to new, current, and former users":[28]



45.    Accordingly, by using Piano's suite of technological tools, including VX, Defendant is able to have "[e]verything [it] know[s] about a user immediately available for segmentation and targeting."[29]

46.    Piano's Chief Executive, Trevor Kaufman, stated, "[d]igital media businesses are increasingly focused on monetizing their loyal users."[30]  Piano's creation provided "publishers and media companies [such as Defendant] with the most effective and usable monetization and analytics tools available."[31]

---

[28] *Id.*

[29] DMP, PIANO, https://piano.io/product/dmp/.

[30] *Piano Media And Tinypass Merge*, Press Release (Aug. 11, 2015), https://piano.io/media/Piano_Press_release.pdf.

[31] *Id.*

47.    One way Piano does this is through Piano Zero, which relies on the collection of user's personally identifiable information by companies like Defendant, and the disclosure of the same to Piano:

> Media companies are uniquely positioned to gather zero-party data—that is, data that is explicitly volunteered (for example, by users filling out a registration form or survey). ***It's personal information, intent and preferences that consumers choose to provide for themselves***, and it adds to the reliable first-party data that media companies also collect by tracking user behavior and content consumption habits.
>
> It's because of this access to zero- and first-party data that we see new ***opportunities for media companies to step up and reclaim ad revenue*** that was previously lost to ad tech middlemen, and to build on their direct relationships with users and advertisers. And Piano is the only end-to-end software provider that can help them seize the opportunity to gather and utilize that data.
>
> …
>
> In order to benefit from their trusted relationship with users and advertisers, media companies need to capture zero-party data from known users. Piano ID, our identity management solution, does that, providing registration and login, authentication and flexible data capture via custom fields. ***It enables you to identify your users across browsers and devices***, and capture user information via progressive profiling—asking for data when it's most relevant. ***You can use all of the data collected in Piano ID to segment and target users for marketing and advertising.***[32]

48.    Elaborating on Piano ID, this service "[t]ransform[s] anonymous visitors into engaged customers by capturing and authenticating valuable user data such as names, email addresses, and passwords."[33] This allows companies like Defendant to "[e]ngage, authenticate and monetize" through "progressive profiling," which allows Defendant to "provide more tailored,

---

[32] INTRODUCING PIANO ZERO: HOW PIANO MEETS PUBLISHER NEEDS IN THE COOKIELESS ERA, https://resources.piano.io/resources/introducing-piano-zero-how-piano-meets-publisher-needs-in-the-cookieless-era/ (emphasis added).

[33] IDENTITY MANAGEMENT, https://www.piano.io/product/activation/identity-management.

personalized experiences based on the user interests and preferences" (*i.e.*, to conduct targeted marketing and advertising based on user information).[34]

49.    Piano also offers Piano ESP, which "knows what your audience wants and delivers it—automating the process of delivering personalized and incredibly relevant recommendations, email campaigns, and newsletters tailored to the individual user — even down to the right subject line, call to action, and send time."[35]   The purpose of this for companies like Defendant is to "skyrocket[] your conversion loyalty and retention rates by keeping your entire audience engaged to a continual stream of relevant content and offers."[36]   And Piano ESP does this by "learning and analyzing your audience across site and email, desktop to mobile – discovering every individual's preferences to recommend the next best experience your users are most likely to click on next."[37]

50.    Defendant also offers the Piano DMP service, which allows companies like Defendant to "[c]ombine first-, second-, and third-party data with volunteered zero-party data. Develop user profiles and audience segments and put the data to work across your sites and multi-channel campaigns.   Integrate zero-party data to ensure data reliability, transparency, and consent – so you can grow your business no matter what big tech companies decide."[38]

51.    More specifically, Piano DMP "gathers data and analyzes it to produce meaningful insight and segments," and "turns data into targetable audiences that deliver accurate, predictive information about future-oriented marketing and audience segmentation."[39]

---

[34] *Id.*

[35] Piano ESP, https://piano.io/de/product/esp/.

[36] *Id.*

[37] *Id.*

[38] Piano DMP, https://piano.io/de/product/dmp/.

[39] *Id.*

52.    The information Piano collects can be "sync[ed] with [Defendant's] preferred ad server and/or marketing tools, to enable real-time action."[40]  In other words, once Piano analyzes and segments user information, that information can be shared with even more third parties for targeted marketing and advertising.  These include "SpotX, Adform, Google Ad Manager, [and] iBillboard."[41]  Indeed, "[e]very day Piano DMP automatically exports segments to various platforms (e.g., SSP and DSP), data providers and social networks.  Among such importers are ad servers where DMP segments are used to target marketing campaigns."

53.    For clarity, a Demand Side Platform or "DSP" "allows advertisers to buy media across multiple sources," while a Supply Side Platform or "SSP" "facilitates the sale of advertising impressions for publishers."[42]

54.    In other words, a DSP allows advertisers to choose what type of persons they want to target (*e.g.*, men under 45 interested in video games), and an SSP allows publishers like Defendant to list "advertising inventory" (*i.e.*, user segments and spots on their website) that caters to the wants of advertisers, and that advertisers can purchase to show ads:[43]



---

[40] *Id.*

[41] AD SERVERS, https://docs.piano.io/ad-servers/.

[42] WHAT IS THE DIFFERENCE BETWEEN AN SSP AND A DSP?, https://advertising.amazon.com/en-gb/library/guides/dsp-ssp-dmp-difference.

[43] WHAT IS AN SSP? | GO FOR TEAL, https://youtu.be/Mziv_DUsnTA?si=y29VCg3ToCpRxOHL&t=73.

55.  Piano explicitly tells companies like Defendant to "incentivize users to provide data by granting access to special content or features" so that Piano can operate off of the widest swath of information.[44]

56.  To summarize, Piano collects extensive user information—which it prompts companies like Defendant to incentivize users to provide.  Piano then Piano ID to identify users and create profiles of their activity.  Those profiles are then segmented and targeted with marketing like e-mails and recommendations through Piano ESP, and/or are disclosed to advertisers through Piano DMP and its integrations with other third parties.  Finally, all of this is monitored by Piano through Piano VX, which allows companies like Defendant to understand how marketing and advertising campaigns are performing and further refine audience segments.

57.  Defendant uses each and every one of the aforementioned features of Piano on its Website, and it discloses e-mail addresses, user IDs, and video titles to Piano for marketing, advertising, and analytics purposes.

## V.    DEFENDANT KNOWINGLY DISCLOSES USERS' PERSONALLY IDENTIFIABLE INFORMATION TO PIANO

58.  Based on the above, it is abundantly clear that Defendant *intentionally* and *knowingly* discloses to Piano its users' personally identifiable information and video-viewing information.

59.  As mentioned above, Defendant discloses a user's 'user ID' to Piano in a singular network transmission with the user's e-mail address and video-viewing information.  Defendant's disclosure of this user ID gives Piano another layer of identification for Piano to further organize

---

[44] *Id*.

and analyze users and its behaviors.  This, in turn, supplies Defendant with improved marketing, advertising, and analytics outcomes as well as boosts revenue from strategic advertisements.

60.    Further, Defendant recognizes and explicitly states that "[c]urrently, our Services do not recognize browser do-not-track signals."[45]  Thus, users who access Defendant's Website, such as Plaintiff, had no ability to prevent Defendant from tracking their personally identifying information and video-viewing information.

61.    Moreover, common sense dictates that a sophisticated media entity like Defendant, who includes a premium data collection and analysis API in its Website, is fully aware of the scope of the data that the third party is collecting.  This shows that Defendant is choosing to intentionally provide user's personally identifiable information—including video-viewing information—to Piano to obtain Piano's analyzing, marketing, and advertising services.

## VI.    PLAINTIFF'S EXPERIENCE

62.    Plaintiff Josue Joseph is a resident and citizen of Brockton, Massachusetts

63.    In 2014, Plaintiff Joseph created a free IGN account on the Website.  Since that time, Plaintiff Joseph has watched numerous pre-recorded videos on the Website while signed into his account and while in Massachusetts.  Plaintiff Joseph most recently viewed a video on the Website in or around September 2023, at which time he was logged into his Website account.

64.    Though his account was free of charge, Plaintiff Joseph was required to provide Defendant with his e-mail address as part of the sign-up process, for which he received numerous benefits such as (i) "[e]ntry into contests and offers"; (ii) "[f]ree game and music magazines"; (iii) "[a]ccess to IGN.com message boards"; (iv) "[t]ext and voice IGN.com chat"; (v) a

---

[45] IGN, Privacy Policy, https://www.ign.com/privacy-policy#policy-2.

"[p]ersonalized My.IGN start page"; (vi) "[c]ustomized gaming newsletters"; and (vii) a "[f]ree IGN.com e-mail address."[46].

65.    At all times relevant, Plaintiff Joseph never consented, agreed, nor otherwise permitted the Website to disclose his PII to third parties.

66.    Likewise, Defendant never gave Plaintiff Joseph the opportunity to prevent the Website from disclosing his PII to third parties.

67.    Nevertheless, each time Plaintiff Joseph viewed a pre-recorded video on the Website, Defendant disclosed Plaintiff Joseph's PII to Piano.  Specifically, Defendant disclosed Plaintiff Joseph's: (i) e-mail address, (ii) user ID, and (iii) the title and URL of the video Plaintiff Joseph watched, including the fact that Plaintiff Joseph actually viewed the video.

68.    Using this information, Piano was able to identify Plaintiff Joseph and attribute his video viewing records to an individualized profile of Plaintiff Joseph.  Indeed, even an ordinary person could identify Plaintiff Joseph using the data Defendant disclosed to Piano.  Piano compiled Plaintiff Joseph's PII and activity on the Website (including video-viewing information), which Defendant used and continues to use for marketing, advertising, and analytics purposes.

## THE PARTIES

69.    Plaintiff Joseph is, and has been at all relevant times, a resident of Brockton, Massachusetts and has an intent to remain there, and is therefore a citizen of Massachusetts.

70.    Defendant IGN Entertainment is a Delaware corporation with its principal place of business at 1716 Locust Street, Des Moines, Iowa 50309.  Defendant develops, owns, and operates the Website, which is used throughout Massachusetts and the United States.

---

[46] BECOME AN IGN MEMBER TODAY, https://www.ign.com/articles/2001/03/09/become-an-ign-member-today-2.

## JURISDICTION AND VENUE

71.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

72.     This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

73.     This Court has personal jurisdiction over Defendant.  By collecting its users' e-mail addresses—which can easily be linked to an individual user, and thus, their address—Defendant knowingly and purposefully collects personally identifiable information from Massachusetts citizens.

74.     Further, as a result of this knowing and purposeful data collection, Defendant serves advertisements on Website directly at Massachusetts users based on their video-viewing history and profile within Defendant's Piano dashboard.  One way Defendant can easily do so is by using users' IP addresses.  Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device.  Thus, knowing a user's IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[47]  An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[48] and (ii) "to target specific households, businesses[,] and

---

[47] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/ (last visited April 24, 2024).

[48] *Location-based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/.

even individuals with ads that are relevant to their interests."[49]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[50] *because* "[c]ompanies can use an IP address … to personally identify individuals."[51]

75.    Defendant also discloses the IP address of its users to Piano, and Defendant receives the IP address of its users when they visit the Website.  Therefore, both Defendant and Piano know the location of Defendant's users, and Defendant can target advertisements at users based on their location.

76.    Defendant derives significant revenue from serving advertisements directed at Massachusetts users.  Thus, Defendant purposefully availed itself of the privilege of doing business in Massachusetts by (i) knowingly collecting the PII of Massachusetts citizens, and (ii) knowingly deriving advertising revenue from its usage and disclosure of that PII and service of advertisements on Massachusetts users.

77.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

78.    **Class Definition:**  Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who created an account on the Website, watched a pre-recorded video on the Website while signed into their IGN account, and had their PII transmitted to a third party (the "Class").

---

[49] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[50] *IP Targeting: Understanding This Essential Marketing Tool*, *supra* note 1.

[51] Trey Titone, *The future of IP address as an advertising identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

79.     Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

80.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

81.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

     (a)     whether Defendant collected Plaintiff's and Class Members' PII;

     (b)     whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

     (c)     whether Defendant's disclosures were committed knowingly; and

     (d)     whether Defendant disclosed Plaintiff's and Class Members' PII without consent.

82.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used the Website to watch videos, and had his PII collected and disclosed by Defendant.

83.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring.  Plaintiff and

his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiff has raised viable statutory claims, of the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

84.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.

**CAUSE OF ACTION**

**COUNT I**
**VIOLATION OF THE VPPA,**
**18 U.S.C. § 2710, *et seq.***

85.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

86.    Plaintiff brings this claim individually and on behalf of the Class against Defendant.

87.    Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," inasmuch as it provides video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via its Website.  18 U.S.C. § 2710(a)(4).

88.    Plaintiff and Class Members are "consumers" as defined by the VPPA because they created an account with Defendant and thus "provide[d] consideration in the form of" personal information, and otherwise established a "commitment, relationship, or association" with Defendant.  *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 488-89 (1st Cir. 2016) (cleaned up).  Under the VPPA, therefore, Plaintiff and Class Members are "subscribers" of "goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).

89.    Plaintiff and Class Members viewed pre-recorded videos on the Website while signed into their IGN accounts.  During these occasions, Defendant disclosed Plaintiff's and Class Members' PII to Piano, a third party.  Specifically, Defendant disclosed Plaintiff's and Class Members: (i) e-mail address, (ii) Piano user IDs, and (iii) the title and URL of the videos Plaintiff and Class Members watched, including the fact that Plaintiff and Class Members.

90.    The information disclosed by Defendant constitutes "personally identifiable information" because it makes it "reasonably and foreseeably likely to reveal which [Local Now]

videos [Plaintiff and Class Members] [] obtained." *Yershov*, 920 F.3d at 486; *see also* 18 U.S.C. § 2710(a)(3). Indeed, the information disclosed by Defendant to Piano enables even an ordinary person to identify which specific videos were watched by Plaintiff or specific Class Members.

91.    Defendant's disclosures of Plaintiff's and Class Members' PII to Piano constitute "knowing[] disclosures" of Plaintiff's and Class Members' "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

92.    Plaintiff and Class Members did not provide Defendant with any form of consent— either written or otherwise—to disclose their PII to third parties.

93.    Nor were Defendant's disclosures made in the "ordinary course of business" as that term is defined by the VPPA. In particular, the Website's disclosures to Piano were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

94.    On behalf of themselves and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: November 22, 2024                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Max S. Roberts*
        Max S. Roberts

Yitzchak Kopel (*Pro Hac Vice Forthcoming*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice Forthcoming*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: ykopel@bursor.com
            mroberts@bursor.com
            vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr. (BBO # 566161)
45 South Main Street, 3rd Floor
West Hartford, CT  06107
Telephone: (860) 955-9455
Facsimile:  (860) 920-5242
Email:  james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

26

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2024, I electronically filed the foregoing document

with the Court's CM/ECF system, which will provide e-mail notice to all counsel of record.

By: */s/ Max S. Roberts*
　　Max S. Roberts