**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

JOSUE JOSEPH, individually and on behalf of all others similarly situated,

Plaintiff,

v.

IGN ENTERTAINMENT, INC.,

Defendant.

Case No. 1:24-cv-11579-MJJ

Hon. Myong J. Joun

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Dated: January 14, 2025

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*Admission Forthcoming*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice Forthcoming*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..........1

ARGUMENT ..........2

I. PLAINTIFF IS A "CONSUMER" UNDER THE VPPA ..........2

A. Plaintiff Is A "Consumer" Under *Yershov* ..........2

B. Defendant's Arguments Are Unpersuasive Or Contradict *Yershov* ..........5

II. DEFENDANT'S DISCLOSURES TO PIANO FALL OUTSIDE THE ORDINARY COURSE OF BUSINESS ..........8

III. DEFENDANT KNOWINGLY DISCLOSED PLAINITFF'S PII TO PIANO ..........12

A. An E-mail Address Is PII ..........13

B. The Title And URL Of A Video Are PII ..........14

C. Defendant Disclosed When Videos Are Played By Class Members ..........14

D. Class Members' PII Is Disclosed To Piano As A Single Transmission ..........16

E. Plaintiff Adequately Pleads Details Of His Testing ..........16

IV. AS EVERY COURT HAS HELD, PLAINTIFF HAS ARTICLE III STANDING ..........17

CONCLUSION ..........20

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Adams v. America's Test Kitchen, LP*,
680 F. Supp. 3d 31 (D. Mass. 2023) .......... 14, 15, 18

*Ade v. Viki, Inc.*,
2024 WL 1880153 (N.D. Cal. Mar. 28, 2024) .......... 9

*Austin-Spearman v. AMC Network Entertainment LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015) .......... 19

*Burdette v. FuboTV Inc.*,
2024 WL 2831466 (N.D. Ill. June 4, 2024) .......... 9, 11

*Cappello v. Walmart Inc.*,
2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) .......... 1

*Carter v. Scripps Networks, LLC*,
670 F. Supp. 3d 90 (S.D.N.Y. 2023) .......... 6

*Collins v. Pearson Education, Inc.*,
721 F. Supp. 3d 274 (S.D.N.Y. 2024) .......... 16

*Collins v. Toledo Blade*,
720 F. Supp. 3d 543 (N.D. Ohio 2024) .......... 4, 10, 15

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019) .......... 13

*Doe I v. Google LLC*,
--- F. Supp. 3d ---, 2024 WL 3490744 (N.D. Cal. July 22, 2024) .......... 11

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... 13, 18

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) .......... 5

*Feldman v. Star Tribune Media Co.*,
659 F. Supp. 3d 1006 (D. Minn. 2023) .......... 15, 19

*Gershzon v. Meta Platforms, Inc.*,
2023 WL 5420234 (N.D. Cal. Aug. 22, 2023) .......... 14

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) .......... 4

*Golden v. NBCUniversal Media, LLC*,
688 F. Supp. 3d 150 (S.D.N.Y. 2023) .......... 14

*Harris v. Public Broadcasting Serv.*,
662 F. Supp. 3d 1327 (N.D. Ga. 2023) .......... 4, 8

*In re Hulu Priv. Litig.*,
2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) .......... 9, 12

*In re Nickelodeon Consumer Privacy Litig.*,
827 F.3d 262 (3d Cir. 2016) .......... 18

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) .......... 3, 7, 11

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) .......... 20

*Kishore v. Times Internet (UK) Ltd.*,
2024 WL 4197619 (N.D. Cal. Sept. 12, 2024) .......... 12

*Lebakken v. WebMD, LLC*,
640 F. Supp. 3d 1335 (N.D. Ga. 2022) .......... 6

*Louth v. NFL Enterprises LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022) .......... 9, 16

*M.K. v Google LLC*,
2023 WL 4937287 (N.D. Cal. Aug. 1, 2023) .......... 8

*Martin v. Meredith Corp.*,
2023 WL 2118074 (S.D.N.Y. Feb. 17, 2023) .......... 15

*Mata v. Zillow Group, Inc.*,
2024 WL 5161955 (S.D. Cal. Dec. 18, 2024) .......... 4

*Nayab v. Cap. One Bank (USA), N.A.*,
942 F.3d 480 (9th Cir. 2019) .......... 8

*Perry v. Cable News Network, Inc.*,
854 F.3d 1336 (11th Cir. 2017) .......... 18

*Rancourt v. Meredith Corp.*,
2024 WL 381344 (D. Mass. Feb. 1, 2024) .......... 5, 9, 10, 16

*Rodriguez v. Sony Computer Ent. Am., LLC*,
801 F.3d 1045 (9th Cir. 2015) .......... 11

*Saleh v. Nike, Inc.*,
562 F. Supp. 3d 503 (C.D. Cal. 2021) .......... 20

*Saunders v. Hearst Television, Inc.*,
711 F. Supp. 3d 24 (D. Mass. 2024) .......... passim

*Sellers v. Bleacher Report, Inc.*,
2023 WL 4850180 (N.D. Cal. July 28, 2023).......... 15

*Spokeo v. Robins*,
578 U.S. 330 (2016).......... 19

*Sterk v. Redbox Automated Retail, LLC*,
2013 WL 4451223 (N.D. Ill. Aug. 16, 2013),
*aff'd*, 770 F.3d 618, 624 (7th Cir. 2014).......... 10, 11

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).......... 20

*United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
489 U.S. 749 (1989).......... 18

*United States v. Hastie*,
854 F.3d 1298 (11th Cir. 2017) .......... 13

*Yershov v. Gannett Satellite Info. Network, Inc.*,
204 F. Supp. 3d 353 (D. Mass. 2016) .......... 1, 17, 18, 20

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016).......... passim

**STATUTES**

18 U.S.C. § 2710.......... 6, 10, 15

**RULES**

Local Rule 7.1 .......... 1

**OTHER AUTHORITIES**

S. Rep. No. 100–599 (1988) .......... 18

# INTRODUCTION

As the old adage goes, "[i]f you have the facts on your side, pound the facts; if you have the law on your side, pound the law; if you have neither … pound the table."[1] Defendant's Motion pounds the table. The fact is Defendant disclosed its users' e-mail addresses and the titles of the videos they watched to a separate and distinct third party (Piano)—and Plaintiff has the testing to back that up—and Defendant did so to generate advertising revenue. *See generally* FAC ¶¶ 18-19, 27, 30, 36, 40-67. The law is that such acts violated the VPPA and caused Plaintiff harm sufficient for Article III standing based on authorities from this Circuit and others. *See*, *e.g.*, *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482 (1st Cir. 2016) ("*Yershov I*"); *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24 (D. Mass. 2024); *Yershov v. Gannett Satellite Info. Network, Inc.*, 204 F. Supp. 3d 353 (D. Mass. 2016) ("*Yershov II*"). So, Defendant pounds the table, ignoring the text of the VPPA and contorting every on-point decision. Defendant even goes as far as to imply that Plaintiff made up quotes in the FAC, even though everything in the FAC is based on quotes that are (or were) publicly available on Piano's website.[2]

The Court should see through this smokescreen. Defendant is here because it chose disclose incredibly revealing PII—users' e-mail address and the titles of the videos they requested or obtained—to a third party for monetary purposes, without taking the incredibly easy step of getting its users' consent first. *Cappello v. Walmart Inc.*, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019) ("It would also not be burdensome to design a website whereby consumers must

---

[1] POUND THE TABLE, https://fordhaminstitute.org/national/commentary/pound-table.

[2] Notably, Defendant failed to raise the issue of the allegedly missing citations with Plaintiff during the Parties' pre-motion meet and confer. *See* Local Rule 7.1 ("No motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or *narrow the issue*.") (emphasis added). Had Defendant done so, Plaintiff could easily have provided the citations instead of wasting the Court's and the Parties' time with extraneous arguments.

click a box confirming their consent to disclosures involving video purchases and click a separate box confirming their consent to all other applicable policies and terms."). The facts and law are clear that such conduct gives rise to a violation of the VPPA and injured Plaintiff within the meaning of Article III. Defendant's Motion should thus be denied.

## ARGUMENT

## I. PLAINTIFF IS A "CONSUMER" UNDER THE VPPA

### A. Plaintiff Is A "Consumer" Under *Yershov*

Defendant argues "Plaintiff's allegation that he signed up for a free IGN account in 2014 does not make him a 'subscriber' [or 'consumer'] under the VPPA." The First Circuit says otherwise.[3] In *Yershov I*, 820 F.3d at 489, the First Circuit held that "downloading a mobile device application" was sufficient to classify the plaintiff as a "subscriber." The holding was clear: "Yershov's decision to download the App seems a fair enough indication that he intended more than a one-shot visit." *Id.* at 487. The First Circuit elaborated on this as follows:

> To use the App, Yershov did indeed have to provide Gannett with personal information, such as his Android ID and his mobile device's GPS location at the time he viewed a video, each linked to his viewing selections. While he paid no money, access was not free of a commitment to provide consideration in the form of that information, which was of value to Gannett. And by installing the App on his phone, thereby establishing seamless access to an electronic version of *USA Today*, Yershov established a relationship with Gannett that is materially different from what would have been the case had *USA Today* simply remained one of millions of sites on the web that Yershov might have accessed through a web browser.

*Id.* at 489. Here, Plaintiff's allegations fit squarely within *Yershov I*. Plaintiff alleges he "created a free IGN account on the Website" and "watched numerous pre-recorded videos on the Website

[3] The VPPA defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

while signed into his account." FAC ¶ 63. The creation of this account suggests Plaintiff "intended more than a one-shot visit" to the Website," and that he "established a[n] [ongoing] relationship with" Defendant. *Yershov I*, 820 F.3d at 487-88. Moreover, the Website is the platform through which Defendant provides video content, meaning Plaintiff subscribed to the very medium through which Defendant provides its video services. FAC ¶¶ 8, 11-12; *see also Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023) ("Jackson does not allege merely that she viewed videos hosted on a website, but rather that she created a Fandom account; became a registered user; provided Fandom with her PII, including her name and email address; and then used Fandom to watch videos.") (cleaned up).

Moreover, Plaintiff's creation of an account formed "an agreement to receive or be given access to electronic texts or services." *Yershov I*, 820 F.3d at 487. Specifically, creating an IGN website account provides users with access to exclusive, account-related benefits. FAC ¶ 17. Plaintiff's IGN account also "was not free of a commitment to provide consideration in the form of [his] information, which was of value to [Defendant]." *Yershov I*, 820 F.3d at 489. That is to say, to create a Website account, Plaintiff had to provide Defendant with his personal information—his e-mail address and a user ID associated with Plaintiff—which Defendant "linked to his [video] viewing selections." *Id.*; *see also* FAC ¶¶ 27, 30, 35, 59, 63, 67-68. This information was clearly of value to Defendant, as Defendant disclosed this information to Piano for marketing, advertising, and data analytics—activities that naturally generate revenue for Defendant. FAC. ¶¶ 13-17, 40-57.

Further, as the Second Circuit noted in finding a plaintiff was a "consumer" where "he gave the NBA valuable personal information in exchange for access to the online newsletter," PII:

> is not insignificant. By receiving it, the NBA learned how to directly reach out to Salazar. It discovered where his device was. It gained

> access to additional information stored in any cookies on his device. These tools increased the NBA's potential to urge Salazar to visit NBA.com and watch videos on it, making the NBA's relationship with him distinct from its relationship with casual NBA.com video-watchers who had not signed up for the newsletter.

*Salazar v. National Basketball Association*, 118 F.4th 533, 552 (2d Cir. 2024). The same is true here. Indeed, Piano confirms Plaintiff's argument, telling clients like Defendant to offer "the right incentives" (*i.e.*, the aforementioned account benefits) to prompt users to "share an email address" (FAC ¶ 16)—thus showing that Defendant considers the e-mail address "consideration" for its account-related benefits.

Thus, Plaintiff is a "consumer" for the purposes of the VPPA. *See also*, *e.g.*, *Saunders*, 711 F. Supp. 3d at 30 (plaintiff was a subscriber where "any time a user views a video on one of Hearst's apps, the full name of the video and/or the video ID is provided to Braze and Google with the user's AAID or user ID"); *Mata v. Zillow Group, Inc.*, 2024 WL 5161955, at *4 (S.D. Cal. Dec. 18, 2024) ("Plaintiff has adequately pled that he is a 'subscriber' of Defendant's website … Plaintiff registered for Defendant's website and created a Zillow account … [and] shared his personal information, including his email address and Facebook ID."); *Harris v. Public Broadcasting Serv.*, 662 F. Supp. 3d 1327, 1331 (N.D. Ga. 2023) (plaintiff was a subscriber where "she registered for a PBS account and provided Defendant her personal information, including her name, address, email, IP address and cookies"); *Collins v. Toledo Blade*, 720 F. Supp. 3d 543, 552 (N.D. Ohio 2024) (finding plaintiffs were "subscribers" where they "gave Defendants their contact information in exchange for the very material that is, writ large, Defendants' main business: news and journalism"); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 721-22 (N.D. Cal. 2023) (finding plaintiff was a "subscriber" where "he provided defendant with his personal information, including his name and email address") (cleaned up); *contra Ellis v. Cartoon Network, Inc.*, 803

F.3d 1251, 1257 (11th Cir. 2015) (finding plaintiff was not a "subscriber" where he "did not sign up for or establish an account with Cartoon Network, did not provide any personal information to Cartoon Network, … [and] did not become a registered user of Cartoon Network or the CN app").

### B. Defendant's Arguments Are Unpersuasive Or Contradict *Yershov*

Defendant contends that because "Plaintiff here was not obligated to create an account in consideration for access to IGN's video content," he cannot be a "consumer." MTD at 11. But the fact that Plaintiff created an optional account strengthens his arguments, as it shows he "intended more than a one-shot visit" to the Website," and an intent to "establish[] a[n] [ongoing] relationship with" Defendant. *Yershov I*, 820 F.3d at 487-88; *see also Rancourt v. Meredith Corp.*, 2024 WL 381344, at *13 (D. Mass. Feb. 1, 2024) ("[R]egardless of whether or not Mr. Rancourt was required to enable GPS tracking on his phone to use the App, he nevertheless did so, and Meredith then allegedly profited from the use of Mr. Rancourt's user data. … [T]his is sufficient to establish that Mr. Rancourt was a subscriber under the VPPA."). And the fact that Plaintiff created an account is exactly what Defendant wants so it can monetize its users' PII through advertising revenue. FAC ¶¶ 13-17, 40-57. Thus, Plaintiff is a subscriber *because* he chose to create a Website account.[4]

Defendant also argues that "[e]ven if Plaintiff's account established some relationship with IGN, Plaintiff alleges nothing connecting that relationship to his access to video content." MTD at 11. But *Yershov I* never imposed such a limitation, and indeed, the opposite conclusion can be

[4] Defendant also contends *Saunders* is inapposite because allegedly, in that case, the plaintiffs were also required to provide PII to use the relevant apps. MTD at 10. That is not only wrong, it is an especially silly argument to make here given undersigned counsel is also counsel in *Saunders*. And in *Saunders*, like here, the defendant argued the plaintiffs were not "consumers" because they were *not* required to provide PII "to access video content on the app[s]." *Saunders*, Case No. 1:23-cv-10998, ECF No. 26 at 5 (D. Mass. Sept. 12, 2023); *see also* Roberts Decl. ¶ 7. Nonetheless, the court held the plaintiffs were "subscribers." *See Saunders*, 711 F. Supp. 3d at 30.

inferred from the opinion. That is, *USA Today* does not exclusively provide videos—it provides written articles—such that downloading the app does not mean a consumer is exclusively subscribing to video content. Yet, *Yershov I* held the plaintiff was a "subscriber" all the same. That is dispositive.

Beyond this, the only circuit court to examine this question head-on—the Second Circuit—found that the term "consumer" "should be understood to encompass a renter, purchaser, or subscriber of *any* of the provider's 'goods or services'—audiovisual or not." *Salazar*, 118 F.4th at 549 (emphasis in original). Holding otherwise is contrary to the "text, structure, and purpose of the VP[P]A." *Id.* at 546; *see also* 18 U.S.C. § 2710(a)(1) ("the term 'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider," which does not include a textual limitation on the types of goods or services someone must subscribe to); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1340 (N.D. Ga. 2022) ("To constitute a 'consumer' under the VPPA, the plaintiff must subscribe to 'goods or services from a video tape service provider,' not a video service as WebMD attempts to frame the issue.").

Defendant argues that *Salazar* is "out-of-circuit," but cites no in-circuit cases supporting its arguments. MTD at 12. Instead, it urges the Court to adhere to the rulings of "many other district courts," citing six out-of-circuit decisions. *Id.* Defendant omits the fact that these decisions uniformly predate *Salazar*, and expressly base their holdings on *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90 (S.D.N.Y. 2023), a decision whose rationale was expressly rejected by the Second Circuit and is no longer good law. Since the issuance of *Salazar*, zero courts have rejected its holding, and Defendant fails to provide any reason for this Court to be the first.

Even assuming Defendant's limitation were correct, Plaintiff would still qualify as a "consumer." In *Yershov I*, the app in question was *USA Today*, which provides written news

content in addition to video content. *See Yershov I*, 820 F.3d at 484 ("In addition to offering *USA Today* in printed form, Gannett digitally offers this content through a proprietary mobile software application called the 'USA Today Mobile App' … The App allows users to access news and entertainment media content, including videos, on their mobile devices."). Yet, the plaintiff there was a subscriber where he created an ongoing relationship with the very medium through which Defendant provided video content, and even though the plaintiff could just as easily have accessed the same video content on the *USA Today* website without such a commitment. *Id.* at 489.

The same is true here. Plaintiff created a Website account, meaning his account creation was directly related to the very medium through which Defendant provides video content. FAC ¶¶ 8, 10-13, 63. And whether or not Plaintiff could have accessed this video content without creating an account, he nonetheless established an ongoing relationship with Defendant that included consideration in the form of his personal information in exchange for exclusive, account-related benefits, and Defendant used that PII for advertising and marketing. *Id.* ¶¶ 15-17, 64; *see also Jackson*, 2023 WL 4670285, at *4 ("Jackson does not allege merely that she viewed videos hosted on a website, but rather that she created a Fandom account; became a registered user; provided Fandom with her PII, including her name and email address; and then used Fandom to watch videos.") (cleaned up).

In addition, as the Second Circuit held, "[t]he VPPA is no dinosaur statute … Our modern means of consuming content may be different, but the VPPA's privacy protections remain as robust today as they were in 1988." *Salazar*, 118 F.4th at 553. To wit, in today's day and age, many video tape service providers—including Defendant—choose not to charge their users a subscription fee, instead funding their ventures through advertising revenue that is powered by the PII these companies collect from account holders and disclose to third parties. FAC ¶¶ 14-17. So,

"[i]t appears evident that subscription to a paid streaming service (like Netflix) … would render [someone] a 'consumer' under the VPPA." *Harris*, 662 F. Supp. 3d at 1332 n.1. But according to Defendant, such consumers lose their VPPA protections if Netflix decides to adopt an ad-supported model like the one Defendant uses here (*i.e.*, consumers create free Netflix accounts and receive benefits in exchange for their PII). That cannot be and is not—the law:

> Suppose a customer in 1988 obtained several videos from a new commercial supplier at no charge, or with money back. We can discern no reason why Congress would have wanted different disclosure rules to apply to those transactions than to ones where a monetary payment is made.

*Salazar*, 118 F.4th at 552 (quoting *Yershov I*, 820 F.3d at 488); *see also Harris*, 662 F. Supp. 3d at 1332 n.1 ("If payment is not required, then a free registration otherwise consistent with registration for those services would likely suffice."). Thus, Defendant cannot avoid the VPPA because it chooses to charge consumers in data rather than dollars.

## II. DEFENDANT'S DISCLOSURES TO PIANO FALL OUTSIDE THE ORDINARY COURSE OF BUSINESS

Defendant argues that its disclosures to Piano are "not actionable because, as alleged, [they] would have been made incident to the ordinary course of business." MTD at 13 (cleaned up). This is wrong. *First*, the ordinary course of business is an affirmative defense that Plaintiffs are not required to plead around. *See M.K. v Google LLC*, 2023 WL 4937287, at *6 n.4 (N.D. Cal. Aug. 1, 2023) (holding a plaintiff "has no duty to foreclose an ordinary course of business defense in his complaint"); *see also Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 494-95 n.4 (9th Cir. 2019) ("The burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits … If the defendant wishes to rely upon the proviso, the burden is upon it to bring itself within the exception.").

*Second*, Plaintiff alleges Defendant "discloses e-mail addresses, user IDs, and video titles to Piano for marketing, advertising, and analytics purposes." FAC ¶ 57; *see also id.* ¶¶ 15-17, 40-56. Defendant does not argue these allegations are not true. Indeed, it implicitly admits Piano "provides [] marketing services." MTD at 14. Numerous courts have found disclosures for such purposes fall outside the ordinary course of business. *See, e.g.*, *Saunders*, 711 F. Supp. 3d at 32 ("The alleged uses of the information here – marketing, advertising, and analytics – do not fall within the exception's narrow list of permissible uses.") (cleaned up); *Rancourt*, 2024 WL 381344, at *17 (holding that disclosures of "App user data as part of its targeted advertising campaign which is intended to drive revenue … [and] better target ads does not constitute an intra-corporate disclosure or a disclosure in support of management operations."); *Burdette v. FuboTV Inc.*, 2024 WL 2831466, at *5 (N.D. Ill. June 4, 2024) ("As targeted marketing and advertising analytics have only ballooned in complexity and pervasiveness … 'order fulfillment' and 'request processing' cannot reasonably be synonymous with marketing activities."); *Ade v. Viki, Inc.*, 2024 WL 1880153, at *3 (N.D. Cal. Mar. 28, 2024) ("The complaint alleges that Viki uses the Pixel to track visitor actions on its website and to better target their products and services on Facebook to interested consumers, thereby increasing its profits … The Court cannot find as a matter of law based on the allegations of the complaint that the purpose of this data-sharing arrangement falls within the ordinary course of business exception."); *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (finding disclosures "to measure analytics and increase advertising revenue … do not fall into the narrow categories statutorily defined as the 'ordinary course of business'"); *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *7 (N.D. Cal. Aug. 10, 2012)

("Market research and web analytics are not in the ordinary course of Hulu's business of delivering video content to consumers.").[5]

Indeed, the VPPA *explicitly regulates* disclosures made for "marketing goods and services directly to the consumer," if the disclosure only includes "the subject matter of such materials"—which here, it does not. 18 U.S.C. § 2710(b)(2)(D)(ii). "If Congress intended to include 'marketing' … where it discussed the 'ordinary course of business,' then it would have done so, and perhaps would not have also addressed 'marketing' in its own subsection." *Collins*, 720 F. Supp. 3d at 554-55. And while the legislative history refers to "mailing houses," "warehouses," and "similar companies," this makes sense because such companies are passive repositories of information and automated distributors to receive customer records. But they may not become involved with analyzing those records or targeting groups with those materials, which is what Plaintiff alleges Piano does here.

Defendant's cited authorities fail to support its argument. Defendant cites *Sterk v. Redbox Automated Retail, LLC*, 2013 WL 4451223, at *5 (N.D. Ill. Aug. 16, 2013), *aff'd*, 770 F.3d 618, 624 (7th Cir. 2014), for the alleged proposition that "disclosures made for third party marketing and advertising" fall within the ordinary course of business exception. MTD at 13. Notwithstanding this ignores what courts in *this Circuit* have found (*see*, *e.g.*, *Saunders*, *Rancourt*, *Louth*), Defendant incorrectly relays the facts of that case. Instead, the only disclosures made to a

---

[5] Defendant implies *Rancourt* supports its argument on this topic. MTD at 14-15. It does not. *Rancourt* noted that "once user information is disclosed to Twilio through the Segment API, Twilio compiles and transmits that information to other third parties that Meredith utilizes for targeted advertising." *Rancourt*, 2024 WL 381344, at *17 (cleaned up). *Rancourt* found such disclosures fell outside the ordinary course of business. *Id*. Similarly, Plaintiffs allege the information disclosed to Piano is then subsequently used for targeted advertising and monetization, including through disclosure to other third parties like "SpotX, Adform, Google Ad Manager, and iBillboard." FAC ¶ 52 (cleaned up); *see also*, *e.g.*, *id.* ¶¶ 53-55. In fact, Piano "automatically" discloses data to "various platforms … data providers and social networks." *Id.* ¶ 52.

third party were for "customer support services" or "to respond to customer service requests." *Sterk*, 2013 WL 4451223, at *4. In fact, as more recent courts in the Seventh Circuit have recognized, *Sterk* holds that "advertising does not fall within VPPA's 'ordinary course of business' exception," and that "'order fulfillment' and 'request processing' cannot reasonably be synonymous with marketing activities." *Burdette*, 2024 WL 2831466, at *5. *Rodriguez v. Sony Computer Ent. Am., LLC*, 801 F.3d 1045, 1054 (9th Cir. 2015), is also distinguishable because that case involved "intra-corporate disclosures" between two Sony entities, not the disclosure of information to an unrelated third party as alleged here. *See* FAC ¶¶ 19, 24-25. And in *Doe I v. Google LLC*, --- F. Supp. 3d ---, 2024 WL 3490744, at *3 (N.D. Cal. July 22, 2024), the plaintiffs did not allege whether the "Google source code is being placed on particular web pages," and did not allege what information would have been disclosed to Google in any event. *See also id.* ("[T]he plaintiffs repeatedly allege that data sent to Google 'may include' specific information like patient device identifiers or search terms … The use of this type of indefinite language makes it unclear what are true factual allegations and what is just speculation."). By contrast, Plaintiff here alleges: (i) that the Piano SDK or API is in fact implemented "into the Website" (FAC ¶¶ 18-19); (ii) what specific information was disclosed to Piano when an account holder watches a pre-recorded video (*id.* ¶¶ 27, 30-36, 39); and (iii) the specific purpose of those disclosures (*id.* ¶¶ 40-57).

Defendant also argues Plaintiff cannot allege that "IGN actually integrates the Piano features alleged." MTD at 14. Notably, Defendant does not argue it *does not* integrate the alleged features of Piano. In fact, Defendant basically admits it uses Piano for "marketing services." MTD at 14. In any event, if Defendant contests the purposes for which it discloses PII to Piano, this raises a question of fact that are not resolvable at the pleadings. *See Jackson*, 2023 WL 4670285, at *5 ("To the extent Fandom challenges Jackson's factual allegations regarding the purpose of

Fandom's data-sharing practices, that factual issue is not appropriate for resolution on a motion to dismiss."); *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *7 ("Whatever the merits are to [defendant's] contentions [regarding the purpose of data-sharing], [p]laintiffs allege unauthorized tracking of [their] data (including video content information). The court cannot resolve this factual issue in a motion to dismiss."); *Kishore v. Times Internet (UK) Ltd.*, 2024 WL 4197619, at *2 (N.D. Cal. Sept. 12, 2024) ("Plaintiffs do not yet have access to specific information about how … Defendant used the Pixel. The Court declines the invitation to decide a factual dispute at the heart of Plaintiffs' case…"). Holding otherwise would require Plaintiff to take discovery on Defendant's contracts with third parties prior to filing suit, which is of course not possible.[6]

## III. DEFENDANT KNOWINGLY DISCLOSED PLAINITFF'S PII TO PIANO

Defendant contends Plaintiff has not alleged a "knowing" disclosure of his PII. MTD at 15. To the extent Defendant is actually challenging whether Plaintiff has alleged its "knowledge" of the disclosures, "the FAC is rife with allegations that [Defendant] knew that it was collecting data from users that identified personalized information about them because, in exchange for the data, [Piano] provided [Defendant] with analytics allowing it to provide advertisements tailored to specific users." *Saunders*, 711 F. Supp. 3d at 31; *see also* FAC ¶¶ 40-57. "These allegations adequately plead knowledge." *Saunders*, 711 F. Supp. 3d at 31. It appears, however, that Defendant's arguments are really geared towards whether Defendant disclosed PII at all. No matter how Defendant's arguments are characterized, they are wrong.

[6] Defendant also argues there are "flaws with Plaintiff's citations in the FAC." MTD at 14 n.7. On the contrary, every quotation in the FAC comes from something that is (or was) on Piano's website. Roberts Decl. ¶¶ 3-6; *id.* Exs. 1-4. Plaintiff also cites to "to a third-party Amazon webpage and a YouTube video" (MTD at 14 n.6) for the definition of a "Demand Side Platform" and "Supply Side Platform," not for Piano's particular features. FAC ¶¶ 53-54. These are terms applicable to the digital advertising industry generally.

### A. An E-mail Address Is PII

Defendant contends an e-mail address is not PII because it allegedly does not "identif[y] him as the video-viewer." MTD at 15 (cleaned up). This is a largely frivolous argument, given *Defendant's own privacy policy* defines an e-mail address as "personal information." IGN PRIVACY POLICY, DATA PROCESSING AND RETENTION, ACCOUNT INFORMATION (PERSONAL DETAILS) ("We process your personal information in order to provide you the best experience of our service … such as, your … email address…").[7] And "[a]s industry leaders, trade groups, and courts agree," an e-mail address is PII. FAC ¶ 29 (cleaned up); *see also id.* ¶ 29 n.17 (quoting interview with advertising execute who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising"); *Saunders*, 711 F. Supp. 3d at 31 (finding plaintiffs alleged disclosure of their PII where they alleged "Hearst disclosed plaintiffs' unique user IDs and AAIDs and, in some cases, their email addresses," in addition to geolocation); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) ("[A]n email address may very well readily enable an 'ordinary person' to identify an individual."); *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual."). Defendant also discloses "a user's unique ID … to Piano," which further identifies the user. FAC ¶ 35.

Against these authorities, Defendant cites *Dancel v. Groupon, Inc.*, 949 F.3d 999 (7th Cir. 2019), for the proposition that "email addresses do not categorically identify an individual." MTD at 15 (cleaned up). But as *Dancel* noted, e-mail addresses "*often*" identify an individual. *Dancel*, 949 F.3d at 1008 (emphasis in original). If an e-mail address "often" identifies an individual, then

[7] Available at https://www.ign.com/privacy-policy.

an e-mail address is "reasonably and foreseeably likely" to identify an individual and is thus PII. *See Yershov I*, 820 F.3d at 486. In addition, "*Dancel* involved the Illinois Right of Privacy Act ('IRPA'), not the [V]PPA, and arose in the context of class certification," not the pleadings. *Gershzon v. Meta Platforms, Inc.*, 2023 WL 5420234, at *6 (N.D. Cal. Aug. 22, 2023). "*Dancel* did not hold that e-mail addresses are not 'personal information' under the [V]PPA," and the standard for what constitutes PII under the VPPA is different than under the IRPA. *See id.*

### B. The Title And URL Of A Video Are PII

Defendant contends that the title and URL of the video Website users view does not suffice to allege that a user "requested or obtained specific video materials." MTD at 16 (cleaned up). It is unclear how the *title of a video* could not identify what video the user watched, and the same is true of the URL for the webpage containing the video. *See*, *e.g.*, *Adams v. America's Test Kitchen, LP*, 680 F. Supp. 3d 31, 42 (D. Mass. 2023) ("[A] simple visit to the URL would provide any third party who receives the information confirmation of the specific video requested or obtained."); *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 160 (S.D.N.Y. 2023) ("[T]he FAC also adequately alleges that Today.com disclosed 'specific video materials'—to wit, each video's URL and name."); *see also* FAC ¶ 38 ("[A] video's URL takes anyone who enters that URL into a[] … browser directly to the webpage containing the video.").

### C. Defendant Disclosed When Videos Are Played By Class Members

Defendant contends that the title and URL of the video viewed do not show whether the user actually watched a video, "as opposed to indicating that a video that can be played appears on the webpage." MTD at 16. But as the dynamic analysis found,

> Defendant discloses to Piano that a user actually watched the video as opposed to simply reading an article. Specifically, a field called "content_type" is sent to Piano. When a user *views a video*, the field is filled is as "video.other," which indicates a video was actually watched.

FAC ¶ 39 (emphasis added). Defendant offers nothing other than rank speculation to contradict these well-established allegations. MTD at 16. In any event, the VPPA penalizes the disclosure of video materials "*requested or obtained*" by a consumer, *not* whether the user actually watched the video. 18 U.S.C. § 2710(a)(3). Indeed,

> [t]he titles of the 146 films that Robert Bork and his family rented from the video store, which prompted Congress to enact this law, were just that: the titles affiliated with his video store account. In Bork's case, there was no information about whether he actually watched all of the videos he and his family rented.

*Collins*, 720 F. Supp. 3d at 551. "Similarly here, Plaintiff[] ha[s] established that [Defendant's Website] ... send[s] [Piano] the URL for the webpage Plaintiff[] visit[ed] plus [his] unique [e-mail address] … This suffices." *Id.*; *see also*, *e.g.*, *Adams*, 680 F. Supp. 3d at 42 ("The fact that Pixel does not track whether a user plays, pauses, or otherwise interacts with the video is irrelevant to the alleged privacy violation, as the information disclosed enables third parties to connect a certain user to certain videos.") (cleaned up); *Sellers v. Bleacher Report, Inc.*, 2023 WL 4850180, at *4 (N.D. Cal. July 28, 2023) (rejecting argument that "plaintiff must distinguish between videos he clicked on and videos that auto-played when he clicked on an article" as "ignore[ing] the plain language of the statute"); *Feldman v. Star Tribune Media Co.*, 659 F. Supp. 3d 1006, 1021 (D. Minn. 2023) ("[E]lectronic disclosures of a person's video-viewing history, even if not explicit, can violate the VPPA.").[8]

---

[8] *Martin v. Meredith Corp.*, 2023 WL 2118074 (S.D.N.Y. Feb. 17, 2023) is distinguishable. In that case, "[t]he court dismissed the claim because the alleged disclosure was limited to the name of a webpage that may contain a video, not the name of the video itself." *Sellers*, 2023 WL 4850180, at *3 (distinguishing *Martin*). Here, however, not only does the URL divulge the name of the video requested or obtained, Defendant also discloses the title of the video and the fact that the user actually played the video. FAC ¶¶ 36-39.

### D. Class Members' PII Is Disclosed To Piano As A Single Transmission

Defendant argues that "Plaintiff does not allege that IGN has linked any information that identifies him as an individual to his viewing behavior." MTD at 16-17. On the contrary, Plaintiff alleges that all of the information at issue—his e-mail address, his user ID, and his video-viewing information—is disclosed "to Piano in a singular network transmission." FAC ¶ 59. Thus, there is no need for Piano to try to link or potentially link all of this information together, as it is already linked/connected together for Piano by Defendant. *Collins v. Pearson Education, Inc.*, 721 F. Supp. 3d 274, 288 (S.D.N.Y. 2024) (finding disclosure of PII where "Pearson discloses to Meta … the specific video name that the digital subscriber requested, the URL, and the digital subscriber's FID to Facebook in a single transmission."). Plaintiff is, of course, happy to show this transmission to Defendant if Defendant is amenable to opening discovery. If not, however, Plaintiff's unrebutted allegations are sufficient at this stage.

### E. Plaintiff Adequately Pleads Details Of His Testing

Defendant attempts to dismiss Plaintiff's dynamic analysis because Plaintiff allegedly omitted details regarding the analysis. MTD at 17. As an initial matter, courts in this Circuit have sustained VPPA claims based on a pre-suit analysis conducted by undersigned counsel. *See*, *e.g.*, *Saunders*, 711 F. Supp. 3d at 28 (sustaining VPPA claim where "[p]rior to filing this case, plaintiffs' counsel retained a private research company to analyze what, if any, personal data is transmitted by Hearst's apps when a user watches a video"); *Rancourt*, 2024 WL 381344, at *2 (same where "[t]hrough an analysis conducted by 'a private research company,' at the behest of Mr. Rancourt's counsel, Mr. Rancourt discovered that Meredith … disclosed to Twilio information about Mr. Rancourt"); *Louth*, 2022 WL 4130866, at *1 (same where "[t]he plaintiff's counsel retained a private research company to conduct a dynamic analysis of the NFL App … [that]

revealed that NFL Enterprises transmits information sufficient to identify class members and the videos they watch to an unrelated third party") (cleaned up).

Further, Plaintiff adequately alleges the contours of the dynamic analysis. Specifically, Plaintiff alleges: (i) what conditions were tested (FAC ¶ 18); (ii) whether an particular third-party services were implemented on Defendant's Website (*id.* ¶ 19); (iii) what information was disclosed to those third parties and under what conditions (*id.* ¶ 27); and (iv) how that information or in what format that information was disclosed (*id.* ¶¶ 30-39, 59). Questions like "how IGN actually configured Piano's technology on its website" are not only questions of fact, but *within Defendant's knowledge*. To the extent Defendant requires more information about the dynamic analysis, Plaintiff is happy to engage in formal discovery, provided Defendant does the same.[9]

## IV. AS EVERY COURT HAS HELD, PLAINTIFF HAS ARTICLE III STANDING

Defendant contends "Plaintiff's FAC claims a purely statutory—not a concrete—harm and cannot, as a matter of law, establish Article III standing." MTD at 18. Defendant does not cite a *single case* dismissing a VPPA claim for lack of Article III standing. Nor can it. Every "circuit court[] that ha[s] addressed the issue of standing under the VPPA—as well as every district court—have reached the opposite conclusion." *Yershov II*, 204 F. Supp. 3d at 361. As the legislative history of the VPPA explains:

[9] Defendant also contends Plaintiff must identify "the source of the encrypted data behind the 'investigation.'" MTD at 17. The source of the data was Defendant's Website. FAC ¶¶ 27, 30-31. To the extent Defendant means Plaintiff must identify the names of his pre-suit investigators, that is not required. *See Saunders*, Case No. 1:23-cv-10998, ECF No. 51 (D. Mass. July 15, 2024) (denying motion to compel the names of plaintiff's non-testifying experts who performed the pre-suit analysis). Plaintiff will ultimately identify an expert to testify about the dynamic analysis, and the expert's report "will necessarily explain the testifying expert's analysis." *Id*.

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.
>
> …
>
> Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes, and dislikes.

S. Rep. No. 100–599 at 5-7 (1988). In other words, the VPPA protects "the individual's control of information concerning his or her person," which has been recognized by "both the common law and the literal understanding of privacy." *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989).

Thus, courts in this Circuit and others have routinely held a violation of the VPPA constitutes an invasion of privacy sufficient for Article III standing. *See*, *e.g.*, *Yershov II*, 204 F. Supp. 3d at 362 ("[T]he VPPA plainly provides plaintiffs like Yershov, who allege wrongful disclosure of their PII, with standing and a right to relief.") (cleaned up); *Adams*, 680 F. Supp. 3d at 40-41 (alleged violations of VPPA were sufficient for Article III standing); *Eichenberger*, 876 F.3d at 983-84 ("[T]he VPPA identifies a substantive right to privacy that suffers any time a video service provider discloses otherwise private information … We therefore join the [] other circuits that … have found Article III standing in similar cases arising under the VPPA."); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017) ("[W]e hold that a plaintiff such as Perry has satisfied the concreteness requirement of Article III standing, where the plaintiff alleges a violation of the VPPA for a wrongful disclosure."); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 274 (3d Cir. 2016) ("Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private."); *Austin-Spearman v. AMC Network Entertainment LLC*, 98 F. Supp. 3d 662, 666

(S.D.N.Y. 2015) ("[E]very court … has reached the same conclusion, affirming that the VPPA establishes a privacy right sufficient to confer standing through its deprivation.").[10]

Defendant contends *Salazar*—a decision finding the plaintiff *had* Article III standing—somehow supports its argument that Plaintiff here does not have Article III standing. MTD at 19-20. Specifically, Defendant claims that because "all Piano's alleged uses of Plaintiff's information are for IGN's use," there can be no Article III standing. MTD at 19. That argument is undermined by *Salazar* itself, where the Second Circuit held:

> Salazar doesn't just allege that his data was exposed to a third party; rather, he asserts that it was disclosed as a result of an arrangement between the NBA and Meta pursuant to which the NBA deliberately uses the Facebook Pixel. This alleged harm is closely related to the public disclosure of private facts analog.

*Salazar*, 118 F.4th at 542. The same is true here, where Plaintiff alleges his PII was disclosed to Piano due to Defendant's deliberate incorporation of Piano's SDK on the Website. *See* FAC ¶¶ 19, 58-61. Moreover, Plaintiff alleges the disclosures were made for targeted advertising (FAC ¶¶ 40-57), including that Piano further "disclose[s] … [Plaintiff's] data" to even more third parties for that purpose. *Salazar*, 118 F.4th at 544; *see also* FAC ¶ 52. *Salazar* also discussed another injury stemming from a VPPA violation—the public disclosure of private facts—and not the loss of control of one's personal information, which courts in this Circuit and others have recognized occurs when the VPPA is violated.

In any event, it does not matter whether Defendant disclosed Plaintiff's PII to Piano for its own benefit or not. Nothing in the text of the VPPA permits a third party to receive such information so long as it was acting "at the direction and for the benefit of" Defendant, and

[10] That some of these authorities pre-date *TransUnion* is immaterial, as that decision "did not overrule or abrogate any part of *Spokeo* [*v. Robins*, 578 U.S. 330 (2016)]," upon which *TransUnion* relies. *Feldman*, 659 F. Supp. 3d at 1016.

Defendant "invite[s] an interpretation that would vitiate the statute's protections." *See Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021) (discussing California privacy statute); *see also James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 954 (N.D. Cal. 2023) (finding invasion of privacy sufficient for Article III standing where "Disney entered into a contractual arrangement with Oracle under which Oracle would collect information from EPSN.com website users so that Disney could market to and attract new customers.") (cleaned up).

In sum, Defendant disclosed Plaintiff's PII to an independent third party so Defendant could monetize Plaintiff's PII through targeted advertising. FAC ¶¶ 15-17, 40-57. In doing so, Plaintiff lost control of who gets to know information about him—because his PII is now in the hands of an independent third party—and Plaintiff neither knew of nor consented to that disclosure. *See* FAC ¶¶ 65-68. As *every court* has found, that is sufficient for Article III standing. *Yershov II*, 204 F. Supp. 3d at 362 n.5 ("Yershov has already suffered an injury defined by the VPPA—the non-consensual disclosure of his PII to Adobe.") (cleaned up); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (listing the "disclosure of private information" as an injury "with a close relationship to harms traditionally recognized as providing a basis for lawsuits").

## CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied in full. To the extent that any portion of Defendant's Motion is granted, Plaintiff respectfully requests leave to amend.

Dated: January 14, 2025

Respectfully submitted,

By: */s/ Max S. Roberts*
Max S. Roberts

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*Admission Forthcoming*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice Forthcoming*)
1330 Avenue of the Americas, 32nd Floor

New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2025, I electronically filed the foregoing document with the Court's CM/ECF system, which will provide e-mail notice to all counsel of record.

By: */s/ Max S. Roberts*
Max S. Roberts