# EXHIBIT 1

2025 WL 1000139
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Michael SALAZAR, individually and on behalf of all others similarly situated, Plaintiff-Appellant,
v.
PARAMOUNT GLOBAL, dba 247Sports, Defendant-Appellee.

No. 23-5748
|
Argued: June 18, 2024
|
Decided and Filed: April 3, 2025

**Synopsis**
**Background:** Digital subscriber filed putative class action against owner of online newsletter providing videos of college sports, claiming violation of Video Privacy Protection Act (VPPA). The United States District Court for the Middle District of Tennessee, Eli J. Richardson, J., 683 F.Supp.3d 727, dismissed complaint, and subscriber appealed.

**Holdings:** The Court of Appeals, Nalbandian, Circuit Judge, held that:

subscriber satisfied injury-in-fact requirement for Article III standing;

subscriber was not "consumer" within meaning of VPPA; and

district court did not abuse its discretion in dismissing complaint with prejudice.

Affirmed.

Bloomekatz, Circuit Judge, concurred in part, dissented in part, and filed opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Lack of Standing; Motion to Dismiss for Failure to State a Claim.

Appeal from the United States District Court for the Middle District of Tennessee at Nashville. No. 3:22-cv-00756—Eli J. Richardson, District Judge.

**Attorneys and Law Firms**

ARGUED: Joshua I. Hammack, BAILEY & GLASSER, LLP, Washington, D.C., for Appellant. David L. Yohai, WEIL, GOTSHAL & MANGES LLP, New York, New York, for Appellee. ON BRIEF: Joshua I. Hammack, BAILEY & GLASSER, LLP, Washington, D.C., Brandon M. Wise, PEIFFER, WOLF, CARR, KANE, CONWAY & WISE, St. Louis, Missouri, for Appellant. David L. Yohai, WEIL, GOTSHAL & MANGES LLP, New York, New York, Robb S. Harvey, HOLLAND & KNIGHT LLP, Nashville, Tennessee, for Appellee. Adam G. Unikowsky, JENNER & BLOCK LLP, Washington, D.C., for Amicus Curiae.

Before: BATCHELDER, NALBANDIAN, and BLOOMEKATZ, Circuit Judges.

NALBANDIAN, J., delivered the opinion of the court in which BATCHELDER, J., concurred. BLOOMEKATZ, J. (pp. —— – ——), delivered a separate opinion dissenting from all but Part II of the opinion and dissenting from the judgment.

**OPINION**

NALBANDIAN, Circuit Judge.

***1** The Video Privacy Protection Act—as the name suggests—arose out of a desire to protect personal privacy in the records of the rental, purchase, or delivery of "audio visual materials." Spurred by the publication of Judge Robert Bork's video rental history on the eve of his confirmation hearings, Congress imposed stiff penalties on any "video tape service provider" who discloses personal information that identifies one of their "consumers" as having requested specific "audio visual materials."

This case is about what "goods or services" a person must rent, purchase, or subscribe to in order to qualify as a "consumer" under the Act. Is "goods or services" limited to audio-visual content—or does it extend to any and all products or services that a store could provide? Michael Salazar claims that his subscription to a 247Sports e-newsletter qualifies him as a "consumer." But since he did not

subscribe to "audio visual materials," the district court held that he was not a "consumer" and dismissed the complaint. We agree and so AFFIRM.

## I.

In September 2022, Michael Salazar brought this class action against Paramount Global, claiming a violation of the Video Privacy Protection Act (VPPA). Salazar claims he used 247Sports.com, a website owned by Paramount that covers college sports recruiting. Salazar alleged that he "began a digital subscription to 247Sports.com in 2022" and that he watched videos on 247Sports.com "while logged into his Facebook account." R.1, Compl. p.4, PageID 4.

Salazar claims that, by then, Paramount had installed Facebook's tracking Pixel on 247Sports.com.[1] The Pixel enabled Paramount to track and disclose to Facebook Salazar's 247Sports.com video viewing history, linked to his Facebook ID, without Salazar's consent. Based on these allegations, Salazar asserted a single claim for relief under the VPPA, seeking actual or statutory liquidated damages. Paramount moved to dismiss the complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief may be granted under Rule 12(b)(6).

1 The Pixel "is a code that allows Facebook to collect the data" of website users "who also have a Facebook account." *Salazar v. Paramount Glob.*, 683 F. Supp. 3d 727, 733 (M.D. Tenn. 2023). If a user watches videos on a website with the Pixel while logged into his Facebook account, the Pixel sends Facebook "the video content name, its URL, and, most notably, the [user]'s Facebook ID." *Id.*

In July 2023, the district court issued an order denying Paramount's request to dismiss the complaint under Rule 12(b)(1) and granting Paramount's request to dismiss the complaint under Rule 12(b)(6). The district court first rejected Paramount's claim that Salazar lacked standing. The court concluded that Salazar's alleged injury—the disclosure of his 247Sports.com video viewing history to Facebook—was an injury in fact because disclosure of personally identifying information to a third party is a concrete harm. And this injury was fairly traceable to Paramount because Salazar alleged that Paramount had installed the Facebook tracking Pixel on 247Sports.com, allowing it to transmit Salazar's video viewing history to Facebook.

***2** Yet the district court dismissed Salazar's complaint for failing to state a claim under the VPPA, concluding he was not a "consumer" under the Act. Salazar claimed that he was a "consumer" under the VPPA because he became a 247Sports.com subscriber (and thus a VPPA "subscriber")[2] when he signed up for an online newsletter.[3] But the court rejected this approach as reading the term "subscriber" "in the abstract." *Salazar v. Paramount Glob.*, 683 F. Supp. 3d 727, 742 n.22 (M.D. Tenn. 2023). Looking to the statutory context, the court noted that the proper question was to ask "whether someone falls within the term 'subscriber of goods or service[s] of a video tape service provide[r]' as properly defined for purposes of the VPPA." *Id.* (quoting 18 U.S.C. § 2710(a)(1)). Reading this provision "as a whole" revealed that the definition of "subscriber" was "cabined by the definition of 'video tape service provider.' " *Id.* at 743–44 (quoting *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 98-99 (S.D.N.Y. 2023)). So incorporating the VPPA's definition of "video tape service provider," 18 U.S.C. § 2710(a)(4), the court concluded that, to qualify as a "consumer," a "plaintiff must be a subscriber of goods and services *in the nature of audio-video* content." *Id.* at 743 n.23.

2 The court properly noted that it did not need to address whether Salazar was a "renter" or "purchaser" under the VPPA because Salazar claimed only that he was a "subscriber" under the Act.

3 The court treated Salazar's allegation that he was a "digital subscriber" as a claim that he subscribed to 247Sports.com's newsletter, rather than registering for a 247Sports.com account or otherwise securing exclusive access to 247Sports.com content. Salazar's briefing concedes as much. *See* Appellant Br. at 18 ("The only remaining question, then, is whether Paramount's online newsletter counts as a 'good or service.' "); *id.* ("Salazar subscribes to an online newsletter."); *id.* at 38 ("Salazar qualifies as a 'consumer' because the newsletters are 'audio visual materials.' ").

Turning to the particulars of Salazar's complaint, the court noted that he failed to "allege that an individual can only access the video content from 247Sports.com through signing up for the newsletter." *Id.* at 744. Or even that he "accessed

audio visual content through the newsletter." *Id.* Since there was no sign that the newsletter was "audio visual content," the court found that Salazar "necessarily" was not a "subscriber" under the VPPA. *Id.* So the court dismissed Salazar's complaint for failing to state a claim. Salazar appealed.

### II.

On appeal, Paramount abandons its challenge to Salazar's standing. But inherent to our jurisdiction is the limitation that "any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013). And standing remains a constitutional minimum that "cannot be waived or forfeited." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019). So we have an independent obligation to confirm the plaintiff's standing before exercising our jurisdiction. *See Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019).

We review standing de novo. *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019). A plaintiff must demonstrate that they have standing "with the manner and degree of evidence required at the successive stages of the litigation." *Murthy v. Missouri*, 603 U.S. 43, 144 S. Ct. 1972, 1986, 219 L.Ed.2d 604 (2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). So what the plaintiff must show is calibrated to the stage of the case—and here we review the grant of a motion to dismiss. To establish Article III standing at this initial stage, "a plaintiff must plead an injury in fact attributable to the defendant's conduct and redressable by the court." *Tyler v. Hennepin County*, 598 U.S. 631, 143 S. Ct. 1369, 1374, 215 L.Ed.2d 564 (2023).

General allegations of harm will not do since injury in fact must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation marks omitted). Physical injury and monetary loss easily satisfy the injury-in-fact requirement. *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 141 S. Ct. 2190, 2204, 210 L.Ed.2d 568 (2021). Some intangible harms also constitute concrete injuries—"[c]hief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* But this "close relationship" to a traditional harm does not require "an exact duplicate in American history or tradition." *Id.* We are analyzing whether the asserted harm is sufficiently analogous to a traditional harm recognized by law—not whether the plaintiff has pleaded an element-by-element match to a historical tort. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341–42, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016); *Ward v. NPAS, Inc.*, 63 F.4th 576, 581 (6th Cir. 2023) (noting that the inquiry focuses on whether the harm alleged is closely related "to the *kind* of harm that the common law sought to protect").

***3** So we address whether Salazar's alleged injury—the disclosure of his 247Sports.com private video-viewing history to Facebook—bears a "close relationship" to intangible harms "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204. To be sure, no common-law tort specifically protects against the disclosure of a person's video-viewing history. But the Supreme Court has recognized that "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 763, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). Indeed, *TransUnion* expressly states that at least a couple of invasions of privacy cause sufficiently concrete injuries—such as "disclosure of private information" and "intrusion upon seclusion."[4] 141 S. Ct. at 2204. Salazar's asserted injury resembles the harms addressed by these torts because he alleges that Paramount disclosed his private information to Facebook without his knowledge or consent. So Salazar can show that he suffered a concrete injury by reference to well-established privacy harms.[5] *See Ward*, 63 F.4th at 579–81. And because Salazar's complaint alleges that Paramount installed the tracking Pixel on 247Sports.com, the claimed harm is also traceable to Paramount's conduct. Finally, an award of damages against Paramount would redress Salazar's injury.

4 The common-law tort of public disclosure of private facts prohibited anyone from "giv[ing] publicity to a matter concerning the private life of another." Restatement (Second) of Torts § 652D (Am. L. Inst. 1977). Similarly, the tort of intrusion upon seclusion protects against "intentional intru[sion], physically or otherwise, upon the solitude or seclusion of another or his private affairs of concerns." *Id.* § 652B. Under this tort, the victim was harmed even if "there is

no publication or other use of any kind of the" information obtained. *Id.* § 652B cmt. b.

5 Indeed, every other circuit to consider the issue agrees that a similar alleged violation of the VPPA confers standing. *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016); *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 982–84 (9th Cir. 2017); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1339–41 (11th Cir. 2017). Although these circuit opinions predate *TransUnion*, several analogized the injury redressed by the VPPA to the same traditional harms discussed by *TransUnion*: invasion of privacy or intrusion upon seclusion. *See, e.g.*, *Eichenberger*, 876 F.3d at 983 (comparing the VPPA to common-law privacy torts); *Perry*, 854 F.3d at 1340–41 (same).

So the district court correctly found that Salazar has standing.[6] Next, we turn to whether it correctly dismissed Salazar's suit for failure to state a claim.

6 In a case closely related to this one, *Salazar v. NBA*, the Second Circuit recently concluded that Salazar had alleged a concrete injury, analogizing his alleged harm to the common law tort of unauthorized public disclosure of private facts. 118 F.4th 533, 541–44 (2d Cir. 2024). Although the panel majority disagrees with the ultimate outcome in that case, we all agree with its decision to reach the merits. We acknowledge that another circuit has distinguished information disclosure to a single company from disclosure to the "public." *See Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1249 (11th Cir. 2022) (en banc) (holding that a plaintiff lacked Article III standing for their Fair Debt Collection Practices Act claim because disclosure to a mail vendor was not sufficiently public to be analogous to the tort of public disclosure of private facts.) Still, *Hunstein* dealt with disclosures to mail processors, rather than the world's largest social media conglomerate —a company that aggregates, uses, and monetizes personal data. *See* R.1, Compl. p.11, PageID 11. More importantly, finding "a close historical or common-law analogue" for the modern injury or harm does not require an exact match for each element of the common-law tort. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 141 S. Ct. 2190, 2204, 210 L.Ed.2d 568 (2021); *Ward v. NPAS, Inc.*, 63 F.4th 576, 580–81 (6th Cir. 2023); *see also Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462–63 (7th Cir. 2020) (Barrett, J.) ("[W]hile the common law offers guidance, it does not stake out the limits of Congress's power to identify harms deserving a remedy."); *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 693 (5th Cir. 2021) ("[O]ur inquiry is focused on the types of harms protected at common law, not the precise point at which those harms become actionable." (quoting *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019)); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) ("Though a single phone call may not intrude to the degree required at common law, that phone call poses the same *kind* of harm recognized at common law.") As the Supreme Court pointed out, there is "an important difference" between the elements of the cause of action and the concrete harm. *TransUnion*, 141 S. Ct. at 2205. So "disclosure of private information" remains one of "those traditional harms" that "is sufficiently concrete to qualify as an injury in fact," even when it fails to meet all of the elements of the common law tort of public disclosure of private facts. *Id.* at 2204.

## III.

***4** On appeal, Salazar claims that the district court erred in granting Paramount's motion to dismiss under Rule 12(b)(6).

When a district court grants a motion to dismiss under Rule 12(b)(6), we review de novo. *Luis v. Zang*, 833 F.3d 619, 625 (6th Cir. 2016). We "accept the complaint's well-pleaded factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor." *Id.* at 626. The complaint's allegations can overcome a Rule 12(b)(6) motion only when they contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

### A.

To see if Salazar made out a claim under the VPPA, we first consider the Act's structure. The VPPA, first enacted

in 1988, creates civil liability for any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). A "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). And a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4).

So to state a claim under the VPPA, Salazar must allege that (1) Paramount is a regulated entity (a "video tape service provider"), (2) he is a protected party (Paramount's "consumer"), and (3) Paramount engaged in prohibited conduct (knowingly disclosing Salazar's "personally identifiable information" to a third party). The district court dismissed Salazar's claim solely because he failed to plausibly allege the second element: that he is a protected "consumer." So we turn to that issue next.

**B.**

To answer whether Salazar plausibly pleaded that he was a "consumer," we ask whether he was a "subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1).[7] In his complaint, Salazar alleged that he was a "consumer" under the VPPA because he "subscribed to a digital 247Sports.com plan that provides Video Media content to the digital subscriber's desktop, tablet, and mobile device." R.1, Compl., p.17, PageID 17. The complaint elsewhere makes clear that this was a *newsletter* subscription: "To register for 247Sports.com, users sign up for an online newsletter." *Id.* at p.6, PageID 6.

7 Of course, Salazar cannot claim that he is a "consumer" unless Paramount is a "video tape service provider" in the first place. But we assume without deciding that Paramount is one. After all, the district court did the same—an assumption that Paramount does not ask us to revisit. *Cf. Osheske v. Silver Cinemas Acquisition Co.*, No. 23-3882, 2024 WL 5487091, at *2 (9th Cir. Mar. 27, 2025) (holding that traditional movie theaters are not "video tape service providers").

Salazar claims that the "broad statutory phrase 'goods or services' plainly includes Paramount's online newsletter." Appellant Br. at 24 (quoting 18 U.S.C. § 2710(a)(1)). To reach that conclusion, Salazar breaks down the VPPA's definition of "consumer" into two separate parts, claiming that it covers anyone who (1) subscribes to "goods or services" from (2) a "video tape service provider." Assuming Paramount is a "video tape service provider," Salazar isolates the meaning of "goods or services." Pointing to dictionary definitions of "goods" and "services," Salazar argues that the "combination of the two terms ... necessarily refers to society's entire economic output." *Id.* at 26. So he concludes that this "all-inclusive" phrase means that the 247Sports.com newsletter is "unquestionably a 'good or service' " from Paramount—a "video tape service provider." *Id.* at 26, 24.

***5** But Salazar errs by reading the terms "goods or services" "in isolation," yielding a definition of "consumer" based "solely on the broadest imaginable definitions of its component words." *Dubin v. United States*, 599 U.S. 110, 143 S. Ct. 1557, 1566, 216 L.Ed.2d 136 (2023) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 138 S. Ct. 1612, 1631, 200 L.Ed.2d 889 (2018)). Learned jurists have long cautioned against making this very mistake. *See Helvering v. Gregory*, 69 F.2d 809, 810–11 (2d Cir. 1934) (L. Hand, J.) ("[T]he meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create."); *FCC v. AT&T, Inc.*, 562 U.S. 397, 406, 131 S.Ct. 1177, 179 L.Ed.2d 132 (2011) ("[T]wo words together may assume a more particular meaning than those words in isolation.").

We don't scrutinize a statute atomistically—chopping it up and giving each word the broadest possible meaning. "Our duty, after all, is to construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S. 473, 486, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015) (internal quotation marks omitted). And often the meaning of a word or phrase "may only become evident when placed in context." *Sackett v. EPA*, 598 U.S. 651, 143 S. Ct. 1322, 1338, 215 L.Ed.2d 579 (2023) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)).

So it remains "a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 142 S. Ct. 2587, 2607, 213 L.Ed.2d 896 (2022) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)). And "[t]his bedrock principle has especial force for 'common

words' like [goods or services] because they are 'inordinately sensitive to context.' " *See* *United States v. Hill*, 963 F.3d 528, 533 (6th Cir. 2020) (quoting *Smith v. United States*, 508 U.S. 223, 245, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (Scalia, J., dissenting)). The statutory phrase "goods or services" "cannot be construed in a vacuum" to wall it off from the meaning imputed by the rest of the statute's text. *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 139 S. Ct. 1743, 1748, 204 L.Ed.2d 34 (2019) (quoting *Davis*, 489 U.S. at 809, 109 S.Ct. 1500).

Indeed, other interpretive canons—such as *noscitur a sociis* or the associated-words canon—reflect the "common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer v. United States*, 603 U.S. 480, 144 S. Ct. 2176, 2184, 219 L.Ed.2d 911 (2024). The associated-words canon instructs interpreters to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Yates v. United States*, 574 U.S. 528, 543–44, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015) (internal quotation marks omitted); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 197 (2012) ("Although most associated-words cases involve listings—usually a parallel series of nouns and noun phrases, or verbs and verb phrases—a listing is not prerequisite. An 'association' is all that is required.") So despite its overly technical name, the word-association canon embodies a simple fact of everyday communication: a general word can be limited by its connection to other words in the same text.

Here, there is an association between the terms "goods or services" and "audio visual materials." So viewing the provision as a whole reveals "a more targeted reading" than the one Salazar proposes. *See* *Dubin*, 143 S. Ct. at 1565. Even though—standing alone—the expression "goods or services" is not limited, its association with surrounding words cabins its meaning. The full definition of "consumer" in the statute does *not* encompass consumers of all "goods or services" imaginable, but only those "from a video tape service provider." 18 U.S.C. § 2710(a)(1). This proviso tethers the definition of "consumer" to that of "video tape service provider." And that definition pinpoints the relevant "goods or services": those involved in the "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). So the most natural reading, which accounts for the context of both definitions, shows that a person is a "consumer" only when he subscribes to "goods or services" in the nature of "video cassette tapes or similar audio visual materials."[8] *Id.* § 2710(a)(1), (a)(4) Together, "text and context point to the same place:" the expression "goods or services" is limited to audiovisual ones. *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 142 S. Ct. 1783, 1790, 213 L.Ed.2d 27 (2022).

8 Salazar contends that Congress "thrice used different language to focus narrowly on audio-visual content" elsewhere in the VPPA, suggesting it "intended 'goods or services' to cover more than just audio-visual content." Appellant Br. at 28. At first glance, Salazar appears to have a point, since "[d]ifferences in language usually lead to differences in meaning." *United States v. Dowl*, 956 F.3d 904, 907 (6th Cir. 2020). But it turns out that one of the three uses of "different language to focus narrowly on audio-visual content" that Salazar references comes in the definition of "video tape service provider." Appellant Br. at 28 ("[I]n the definition of 'video tape service provider,' Congress deployed the term 'prerecorded video cassette tapes or similar audio visual materials.' ") (quoting 18 U.S.C. § 2710(a)(4)). And since the VPPA's definition of "consumer" covers only "goods or services from a *video tape service provider*," Congress incorporated the latter provision's express narrowing reference to "audio visual materials." 18 U.S.C. § 2710(a)(1), (4).

***6** Some might resist this conclusion, arguing that it adds an unexpressed limitation to the text. Not so. Our approach is not just consonant with textualist interpretation, it is required by it. The pure definitional meaning of words in isolation shouldn't be confused with the plain meaning of the text. *See* *Hill*, 963 F.3d at 536–37. Instead, the plain meaning of any word "is informed by its surrounding context" and the other words in the statute. *Diaz v. United States*, 602 U.S. 526, 144 S. Ct. 1727, 1735, 219 L.Ed.2d 240 (2024). This "[c]ontext also includes common sense" such that "[c]ase reporters and casebooks brim with illustrations of why literalism—the antithesis of context-driven interpretation—falls short." *Biden v. Nebraska*, 600 U.S. 477, 143 S. Ct. 2355, 2379, 216 L.Ed.2d 1063 (2023) (Barrett, J., concurring). And "[c]ontext from the time of [the VPPA's] enactment ... confirms that the statute does not reach" all possible goods and services. *See* *Thompson v. United States*, No. 23-1095, ––– U.S. ––––, ––– S.Ct. ––––, ––––, ––– L.Ed.2d ––––, 2025 WL 876266, at *5 (U.S. Mar. 21, 2025).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

As discussed, the terms "goods or services" are linked to those goods and services provided by a company when it is acting as a "video tape service provider"—namely "audio visual materials." So "in construing [the VPPA], we must also take into account the broader statutory scheme," which focuses on privacy protections for records of transactions related to audio-visual goods and services. *See City & County of San Francisco v. EPA*, ––– U.S. ––––, 145 S. Ct. 704, 717, ––– L.Ed.2d –––– (2025). Adopting this best reading of the statute is not adding a new limitation where one did not exist. Instead, we merely recognize a limitation that was included in the statute's plain meaning at the time it was signed into law.[9]

9 For those persuaded by such evidence, the VPPA's legislative history bolsters this reading:

> [S]imply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill. For example, a department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products.

S. Rep. No. 100-599, at 12.

In doing so, we break with the Second and Seventh Circuits' approach to this issue. Considering a virtually indistinguishable complaint filed by the same plaintiff, the Second Circuit held that the statutory term " 'consumer' should be understood to encompass a renter, purchaser, or subscriber of *any* of the provider's 'goods or services'—audiovisual or not." *Salazar v. NBA*, 118 F.4th 533, 549 (2d Cir. 2024). So the court concluded that "it's the definition of 'personally identifiable information' that limits what can be shared, not the definition of 'consumer.' " *Id.* at 548. And the Seventh Circuit echoed this conclusion in an "almost identical" case. *Gardner v. Me-TV Nat. Ltd. P'ship*, 24-1290, ––– F.4th ––––, ––––, 2025 WL 942835, at *3 (7th Cir. Mar. 28, 2025).

Respectfully, we disagree. It's far from the most natural reading to see the term "personally identifiable information" as limiting because the statute defines it with the term "includes"—unlike the other definitions which use the word "means." 18 U.S.C § 2710(a)(3). And when a "definition is introduced with the verb 'includes' instead of 'means' ... it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012); *see also* Scalia & Garner, *supra*, at 132–33 (describing this as "the rule both in good English usage and in textualist decision-making"). So it's not clear that "personally identifiable information" always has to "identif[y] a person as having requested or obtained specific video materials or services." 18 U.S.C § 2710(a)(3).

Yet the Second Circuit sees this definition of "personally identifiable information" as the floodgate preventing VPPA liability for "the general store owner who ... disclos[es] particular customers' bread-buying habits." *Salazar v. NBA*, 118 F.4th at 549. Indeed, that court viewed this definition as making clear that the terms "goods or services" should be construed broadly to prevent redundancy in the statute. *Id.* But if that is true, it seems odd that Congress would put such a pivotal limitation in a nonexclusive definition. The Second Circuit acknowledges that fact—though only in a footnote. *Id.* at 549 n.10. And since the definition is illustrative rather than exhaustive, it's not clear how interpreting "goods or services" to be audio-visual materials would render that definition's reference to videos "superfluous." *Id.* at 548. The better reading remains that "goods or services" relates to audio-visual materials and the definition of "personally identifiable information" merely provides an example of what information a "video tape service provider" can't disclose to others.[10]

10 The First Circuit has also suggested that subscribers to non-video materials (specifically, apps) can be "consumers" under the VPPA. *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 487–90 (1st Cir. 2016) (finding that plaintiff plausibly pleaded he was a "consumer" by alleging that he downloaded and watched videos on the *USA Today* App). But the case is readily distinguishable on the facts because the *Yershov* plaintiff at least pleaded that he used his subscription to access audio-visual materials. *Id.* at 485. (noting that the plaintiff "used the App to read news articles and watch numerous video clips"). And the application disclosed the plaintiff's personal information and viewing history "at the time he viewed a video" through the application. *Id.* at 489. By contrast, Salazar's complaint failed to allege that he watched videos on the newsletter's emails or through hyperlinks included in them.

***7** Turning to how this applies to Salazar's case, we ask whether the 247Sports.com newsletter is a "video cassette

tape or similar audio visual material." Salazar claims it is because it "contained links to videos, directed subscribers to video content, and otherwise enticed or encouraged them to watch Paramount's videos." Appellant Br. at 36. But Salazar's complaint failed to allege that the newsletter did any of these or that he had accessed videos through the newsletter. If anything, the complaint suggested that the relevant videos were accessible to anyone, even those without a newsletter subscription, by going directly on 247Sports.com. *See* R.1, Compl., p.11, PageID 11 ("[A] user visits 247Sports.com and clicks on an article ... and watches the video in the article."). So Salazar did not plausibly allege that the newsletter itself was an "audio visual material."

Standing alone, Salazar's allegation that he subscribed to 247Sports.com's newsletter was not enough to render him a "consumer" under the VPPA—making the district court's dismissal of his suit proper.

## IV.

But that is not the end of the case. Salazar claims that, even if dismissal were proper, the district court erred "as a matter of law" by refusing to grant him "leave to amend his complaint to add allegations to establish that the online newsletters were 'audio-visual materials.' " Appellant Br. at 40.

When a district court dismisses a complaint with prejudice, we review for abuse of discretion. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003). Generally, district courts "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). But when "a party does not file a motion to amend or a proposed amended complaint in the district court, it is not an abuse of discretion for the district court to dismiss the claims with prejudice." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs., LLC*, 700 F.3d 829, 844 (6th Cir. 2012) (internal quotation marks omitted); *see also Crosby v. Twitter, Inc.*, 921 F.3d 617, 627–28 (6th Cir. 2019) (affirming dismissal with prejudice because plaintiff failed to file a formal motion to amend).

Salazar filed neither a motion to amend nor a proposed amended complaint. Instead, he requested leave to amend his complaint only in a single cursory footnote at the end of his response to Paramount's motion to dismiss: "To the extent the Court grants Defendant's motion, Plaintiff respectfully requests that he be permitted to amend his complaint to address any issues the Court raises in its Order." R.24, Opp'n to Mot. to Dismiss, p.21 n.17, PageID 146. This "cursory request" did not "explain how a second amended complaint would resolve the problems in the first." *Crosby*, 921 F.3d at 628. So the district court did not abuse its discretion in dismissing Salazar's complaint with prejudice.

## V.

For these reasons, we AFFIRM.

## CONCURRENCE / DISSENT / DISSENT FROM JUDGMENT

BLOOMEKATZ, Circuit Judge, concurring in part, dissenting in part, and dissenting from the judgment.

The majority opinion holds that Michael Salazar is not a "consumer" under the Video Privacy Protection Act (VPPA) because he did not subscribe to " 'goods or services' *in the nature of* 'video cassette tapes or similar audio visual materials' " from 247Sports.com. Maj. Op. at —— (emphasis added) (quoting 18 U.S.C. § 2710(a)(1), (a)(4)). But the statute doesn't say that. And where, as here, a straightforward reading of the statute's plain language does not lead to absurd or anomalous results, we're not allowed to read in extratextual limitations. I agree that we have jurisdiction to resolve Salazar's claim, so I concur in Part II of the majority opinion. On the merits, however, the majority's reading of the VPPA contravenes the plain language of the statute and, thus—perhaps unsurprisingly—conflicts with the reasoning of our sister circuits. I respectfully dissent.

## ANALYSIS

***8** Michael Salazar signed up for a newsletter from Paramount Global, doing business as 247Sports.com, a website that provides news coverage of college sports. To sign up, Salazar provided his email address and his IP address, the latter of which reveals information about his physical location. After he signed up, Paramount sent him a daily newsletter with links to articles (many of which contained videos), photographs, and other content. Salazar alleges that, through the Facebook Pixel that Paramount installed on the 247Sports.com website, Paramount collected data about his

identity and the videos he watched and then disclosed that information to Facebook without his consent.

Salazar sued Paramount under the VPPA. Congress passed the VPPA, also known as the "Bork bill," to increase video privacy after a newspaper published a profile about then-Supreme Court nominee Judge Robert Bork based on almost 150 movies he and his family had rented from a video store. S. Rep. No. 100-599, at 5 (1988). The VPPA provides a cause of action against a "video tape service provider" that "knowingly discloses" a "consumer['s]" "personally identifiable information," which includes information about the "specific video materials or services" the consumer has "requested or obtained." 18 U.S.C. § 2710(a)(3), (b)(1). That's a lot of defined terms to apply. Luckily, they're not all in dispute. As the majority explains, this case turns on whether Salazar is a "consumer" within the VPPA's definition. *See* Maj. Op. at ——.

In my view, he is.

**I. Plain Text Reading of "Consumer"**

The plain text is all that is necessary to resolve this case.

To determine whether Salazar is a "consumer" within the meaning of the VPPA, we start with the plain text of the statute. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484, 143 S.Ct. 1206, 215 L.Ed.2d 444 (2023). Unless terms are specifically defined, we look to their ordinary meaning. *Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019). This includes how the terms are used in their surrounding context. *See United States v. Hill*, 963 F.3d 528, 533–34 (6th Cir. 2020). When the "text is clear, 'this first step of the interpretive inquiry is our last.' " *United States v. Stewart*, 73 F.4th 423, 425 (6th Cir. 2023) (quoting *Rotkiske v. Klemm*, 589 U.S. 8, 13, 140 S.Ct. 355, 205 L.Ed.2d 291 (2019)).

The VPPA defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). By this provision's plain text, Salazar is a "consumer" under the VPPA.

Some of the words in the definition of "consumer" are undefined, so I afford them their plain meaning. *See Keen*, 930 F.3d at 802. Relevant here, Salazar contends that he is a consumer because he is a "subscriber" of "goods or services" from Paramount. Congress did not define either of those statutory terms. In determining the meaning of those terms, "contemporaneous dictionaries are the best place to start." *Id.* To "subscribe" is "to put one's name down as a purchaser of shares, a periodical, newspaper, or book, etc." *Subscribe*, 17 *Oxford English Dictionary* 54 (2d ed. 1989). As several of our sister circuits have held, the "purchase[ ]" need not be monetary—providing personal information suffices. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 552 (2d Cir. 2024); *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256–57 (11th Cir. 2015); *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 487–89 (1st Cir. 2016); *Gardner v. Me-TV Nat'l Ltd. P'Ship*, ––– F.4th ––––, –––– – ––––, 2025 WL 942835, at *2–*3 (7th Cir. 2025). So, a "subscriber" generally refers to a person who, by providing some sort of consideration, opts in advance to receive "goods or services" of a continuing or periodic nature from the provider. *See Ellis*, 803 F.3d at 1255–56; *Yershov*, 820 F.3d at 487 (collecting dictionary definitions). In turn, "goods" ordinarily refers to "movable property," and "services" refers to "[t]he section of the economy that supplies needs of the consumer but produces no tangible goods." *Good*, 6 *Oxford English Dictionary* 673 (2d ed. 1989); *Service*, 15 *Oxford English Dictionary* 37 (2d ed. 1989).

***9** Under the statute, those "goods or services" must be "from a video tape service provider." 18 U.S.C. § 2710(a)(1). The VPPA defines that phrase in relevant part as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). **1-O2** Based on this language, a "video tape service provider" need not be exclusively, or even primarily, engaged in the "rental, sale, or delivery of prerecorded cassette tapes or similar audio visual materials." *See id.*; *NBA*, 118 F.4th at 548. Congress included "any person engaged in" the business of renting, selling, or delivering audio visual materials akin to video cassette tapes, capturing department stores, supermarkets, or other companies that are "engaged" in many commercial pursuits, including the "rental, sale, or delivery" of video tapes and the like. *See* S. Rep. No. 100-599, at 12 (explaining how the VPPA would apply to a department store); *NBA*, 118 F.4th at 548. Indeed, while Judge Bork rented videos from a local video store, the disclosure of his viewing history would not have been any less invasive had he rented from a supermarket that had a video rental department. (I remember when some did.) The VPPA, by its plain text, counts both stores as "video tape service providers" and would have prohibited either from disclosing his rental history.

1 The full definition is, "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2), but only with respect to the information contained in the disclosure." 18 U.S.C. § 2710(a)(4).

So how does this definition of "consumer" match up to Salazar's allegations? Salazar is a "subscriber" under the VPPA. He gave his personal information—his email address and IP address—in exchange for receiving a periodic (daily) newsletter from 247Sports.com via email. [2-O2] The newsletter is a "good[ ] or service[ ] from [Paramount]." Neither Paramount nor the majority disputes that the phrase "goods or services," in common parlance, includes newsletters. *See* Maj. Op. at —— – —— (discussing the "relevant 'goods or services' " covered by the VPPA); Appellee Br. at 27 (arguing that Congress did not intend for the VPPA "to cover all the goods and services offered by a video tape service provider"); *see also* Op. & Order, R. 33, PageID 281 n.19 (declining to address whether the newsletter is a "good[ ] or service[ ]," instead holding only that Salazar is not a "subscriber of goods or services from a video tape service provider"). And finally, Paramount is a "video tape service provider," as it "engage[s] in the business" of delivering video content. 18 U.S.C. § 2710(a)(4). [3-O2] Putting these terms together, it's not hard to see that Salazar qualifies as a "consumer" under the VPPA: he is a "subscriber" (a registered, regular recipient) of "goods or services" (the newsletter) from a "video tape service provider" (Paramount). This straightforward application of the statute's plain meaning follows the two other circuits to reach this issue. *See* *NBA*, 118 F.4th at 537 (2d. Cir.) (holding that, according to the provision's "plain meaning," a subscriber to the NBA's online newsletter is a "consumer" under the VPPA); *Gardner*, —— F.4th at ——, 2025 WL 942835, at *2 (7th Cir.) (holding that "[a]ny purchase or subscription from a 'video tape service provider' satisfies the definition of 'consumer', even if ... the thing subscribed to is a newsletter.").

2 Tellingly, if Salazar does not want to receive the newsletter anymore, Paramount allows him to "unsubscribe." Ex. A, R. 17-1, PageID 100.

3 Paramount does not dispute in this appeal that it is a "video tape service provider." The majority, like the district court, assumes that it is. Maj. Op. at —— n.7.

The majority reaches a different conclusion—but only by rewriting the plain language of the VPPA.

### II. The majority's atextual reading of "goods or services from a video tape service provider."

In holding that Salazar is not a "consumer," the majority focuses on the fact that the VPPA's definition requires a plaintiff to be a consumer of not just any "goods or services," but "goods or services from a video tape service provider." Maj. Op at —— – ——. It holds that the "most natural reading" of this full phrase is that "a person is a 'consumer' only when he subscribes to 'goods or services' *in the nature of* 'video cassette tapes or similar audio visual materials.' " *Id.* at —— (emphasis added) (quoting 18 U.S.C. § 2710(a)(1), (a)(4)). But the statute doesn't have this limitation. The majority has written it in. As noted, the VPPA states that a consumer is "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *See* 18 U.S.C. § 2710(a)(1). The majority's reading effectively adds the limiting words "audio visual" before "goods or services" in the statutory text: now, a consumer is "any renter, purchaser, or subscriber of [audio visual] goods or services from a video tape service provider." I don't think we can insert those words into the statute. *Borden v. United States*, 593 U.S. 420, 436, 141 S.Ct. 1817, 210 L.Ed.2d 63 (2021) (plurality opinion).

***10** The majority's defense of this edit does not persuade me. At the heart of the majority's interpretation is the principle that courts must read statutory language in context. The majority appears to acknowledge that the plain meaning of "goods or services" includes the online newsletter, but it stresses that we cannot read "goods or services" in isolation. *See* Maj. Op. at —— – ——. I agree, of course. It is a well-established and common-sense rule that courts can't isolate words in a statute and give them a meaning that would not make sense in context, as "words together may assume a more particular meaning than those words in isolation." *Id.* at —— (quoting *FCC v. AT&T, Inc.*, 562 U.S. 397, 406, 131 S.Ct. 1177, 179 L.Ed.2d 132 (2011)). Take a different example from the same VPPA provision—the word "subscriber." In isolation, the word "subscriber" could mean a person who subscribes to the tenets of a religion or other beliefs, where there is no need for registration, an exchange, or a relationship between two

people or entities. *Subscriber*, 17 *Oxford English Dictionary* 54 (2d ed. 1989). But the statute says "subscriber of goods or services," so it is most naturally read as referring to a different definition of subscriber.

Following the basic rule that courts look at words in context, the majority concludes: "The full definition of 'consumer' does *not* encompass all 'goods or services' imaginable, but only those 'from a video tape service provider.' " Maj. Op. at —— (quoting 18 U.S.C. § 2710(a)(1)). Again, I agree. The "good or service" must be "from a video tape service provider." But here, it is. The newsletter is from Paramount, undisputedly a "video tape service provider." As the Seventh Circuit aptly asked, "What more is required?" *Gardner*, —— F.4th at ——, 2025 WL 942835, at *2. Purchasing any good—such as "a Flintstones sweatshirt or a Scooby Doo coffee mug or a Superman action figure or a Bugs Bunny puzzle"—from a video tape service provider like Paramount will do. *Id.* Thus, Salazar satisfies the definition of "consumer."

Not so, the majority says, because context limits the statutory language even further. It holds that the "goods or services" must not only be "from a video tape service provider," as the statute dictates—they must be "audio visual" in nature. Maj. Op. at —— – ——. That's because, the majority reasons, by specifying that the "goods or services" must be "from a video tape service provider," the provision "pinpoints the relevant 'goods or services' " as "video cassette tapes or similar audio visual materials." *Id.* at —— – —— (quoting 18 U.S.C. § 2710(a)(1), (a)(4)). But how? Sure, to be a "video tape service provider," a company must engage in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). But Congress knew that "video tape service providers" could rent, sell, or deliver other types of "goods or services" too. Remember that the definition was drafted to include department stores, supermarkets, and other entities that rent, sell, or deliver the requisite audiovisual materials. *See* S. Rep. No. 100-599, at 12. The majority acknowledges as much, albeit in a footnote. *See* Maj. Op. at —— n.9. So, when Congress provided that a "consumer" must get "goods or services from a video tape service provider," I wouldn't assume it meant only a subset of all the "goods or services" Congress knew "video tape service providers" do business in. And it's far from the most "natural" reading of the phrase to say that "goods or services from a video tape service provider" can only be *some particular* "goods or services" from that entity. *Id.* at ——.

If anything, the statutory context statute reinforces Salazar's plain-language interpretation. "[V]iewing the provision as a whole," *id.* at ——, reveals that Congress knew how to limit "goods or services" to those of an audiovisual nature when it wanted to, *see* *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58, 142 S.Ct. 1783, 213 L.Ed.2d 27 (2022) (citing the "meaningful-variation canon"). For example, the statute defines "personally identifiable information" as information "identif[ying] a person as having requested or obtained *specific video materials or services* from a video tape service provider." 18 U.S.C. § 2710(a)(3) (emphasis added). That "specific video" modifier is notably absent from the "goods or services" referenced in the definition of "consumer." *See* *id.* § 2710(a)(1). I don't think we should override Congress's choice not to similarly modify the phrase "goods or services" in that definition. *See* *Saxon*, 596 U.S. at 458, 142 S.Ct. 1783 (respecting the distinction Congress made in using "more open-ended formulations" in some places, and a "narrower" phrase in another (citation omitted)); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

***11** The absence of the "specific video" modifier is particularly telling given the other similarities between the definitions of "personally identifiable information" and "consumer." Recall that the majority focuses on the fact that the definition of "consumer," 18 U.S.C. § 2710(a)(1), says "goods or services *from a video tape service provider*," Maj. Op. at ——. And the majority concludes that, in context, "*from a video tape service provider*" means the goods or services must be audiovisual ones. *Id.* at —— – —— (emphasis added). The statutory definition of "personally identifiable information," 18 U.S.C. § 2710(a)(3), has the same limiting context the majority emphasizes: it says that the "materials or services" must be "from a video tape service provider," *id.* Yet it *also* says that they must be "*specific video* materials or services from a video tape service provider." *Id.* (emphasis added). If the majority were correct that "goods or services," when followed by the phrase "from a video tape service provider," covers only audiovisual materials, Congress would not have needed to limit the scope of "materials or services from a video tape services provider" in its definition of "personally identifiable information." *See* *Crump v. Blue*, 121 F.4th 1108, 1111 (6th Cir. 2024) (noting that Congress's decision to vary language "is telling"). Its

reference to "specific video" materials or services would be superfluous. Reading the VPPA as the majority does runs counter to the "cardinal principle" that we should give meaning to every "clause, sentence, or word" in the statute. *United States v. Malone*, 889 F.3d 310, 312 (6th Cir. 2018) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001)); *see also NBA*, 118 F.4th at 548.

The majority's reliance on *noscitur a sociis* doesn't help either. Maj. Op. at ——– ——. As the majority explains, *noscitur a sociis* tells us that a term's meaning is affected by the words with which it is "associated." *Id.* at ——. The canon "instructs interpreters to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words.' " *Id.* (quoting *Yates v. United States*, 574 U.S. 528, 543–44, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015)). For instance, the Supreme Court recently applied this canon in *Fischer v. United States*—a case the majority relies on—to clarify the scope of 18 U.S.C. § 1512, a criminal obstruction statute. 603 U.S. 480, 144 S.Ct. 2176, 219 L.Ed.2d 911 (2024). The Court held that § 1512(c)(2), which extends liability to one who "otherwise obstructs, influences, or impedes any official proceeding," is limited by the immediately preceding clause, § 1512(c)(1), which imposes liability on one who "alters, destroys, mutilates, or conceals a *record, document, or other object*" intended for use in an official proceeding. *Id.* at 497–98, 144 S. Ct. 2176, 2184. In applying both the *noscitur* canon and the canon against superfluity, the Court followed the "common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Id.* at 487, 144 S. Ct. 2176, 2184. So, it held that the "otherwise" clause is limited to offenses involving the "records, documents, and objects" referenced in § 1512(c)(1). *Id.* at 498, 144 S. Ct. 2176, 2184. And the Court reasoned that the "history of the provision" bolstered its conclusion because the statute was intended to respond to a "loophole" that made it difficult to prosecute people for obstructive document destruction during the Enron scandal. *Id.* at 491–92, 144 S. Ct. 2176, 2184. The Court concluded: "It would be peculiar to conclude that in closing the Enron gap, Congress actually hid away in the second part of the third subsection ... a catchall provision that reaches far beyond the document shredding and similar scenarios that prompted the legislation in the first place." *Id.* at 492, 144 S. Ct. 2176, 2184.

Does reading the definition of "goods or services" according to its plain language make the provision "inconsistent with its accompanying words," "render meaningless" other parts of the statute, or depart from the statute's purpose, thereby triggering this limiting construction? I don't think so. The majority doesn't even contend that it does or identify any such examples. That's telling.

Paramount tries to identify an inconsistency between the plain-text interpretation and the VPPA's purpose to justify its limiting construction, but it fails. It argues that the phrase "goods or services" in the definition of "consumer" cannot extend to "the whole economy writ large" because the purpose of the statute was narrow—protecting privacy over audiovisual materials only. Appellee Br. at 22. As the legislative history demonstrates, Congress enacted the VPPA "to preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials." Act of Nov. 5, 1988, Pub. L. 100-618, 102 Stat. 3195. But giving the phrase "goods or services" a broader meaning than "specific video materials or services" fits comfortably with that purpose. It brings consumers within the statute's reach if they have engaged in any transaction regarding "goods or services from a video tape service provider," because any transaction could give a provider the data it needs to connect a person with their video consumption activity. And that information about video consumption is then protected from disclosure.

***12** True, under this interpretation "a consumer who buys a hammer"—or any other nonvideo material—"then watches free videos on the vendor's website" enjoys the privacy protections of the VPPA. *NBA*, 118 F.4th at 550 (using the defendant's proposed hypothetical). But, as the Second Circuit held, "considering the privacy protective goals of the VPPA with respect to individuals' video viewing information," that's not "anomalous." *Id.* Instead, "*allowing* disclosure of the consumer's video viewing information [in this scenario] would be out of sync with the statute's goals." *Id.*

Nor is applying the definition of "consumer" to purchasers of nonvideo goods "nonsensical," as the district court reasoned. Op. & Order, R. 33, PageID 285. Consider the same hypothetical. When purchasing a hammer on the "video tape service provider's" website, an individual provides personal information. And the video tape service provider can link that personal information with the free videos the individual later watches on its website. If a video tape service provider can link a person's personal information to their video preferences, Congress would have wanted to prohibit disclosure, regardless of whether the information came from the precise transaction involving the video material or got

"stitched together" with other non-video transactions. Reply Br. at 17. It makes no difference for achieving the statute's privacy goals. Accordingly, the VPPA's purpose does not compel a narrower interpretation of "goods or services" in the definition of "consumer"; it confirms the plain-language interpretation I would adopt. *See Fischer*, 603 U.S. at 491–92, 144 S.Ct. 2176 (considering what "prompted the legislation in the first place" to confirm its reading of the text).

Lastly, Paramount's amicus presents a consequentialist argument against a plain-language reading of the statute. Amicus cautions us not to "retrofit[ ]" a statute "designed to protect people who rented VHS and Betamax videocassettes at brick-and-mortar video rental stores" to regulate the internet, and it fears that reading the VPPA in accordance with its terms' plain language would "fundamentally transform the Internet." Amicus Br. at 3, 13. Consequentialist reasoning cannot change the meaning of clear text, *see Niz-Chavez v. Garland*, 593 U.S. 155, 171, 141 S.Ct. 1474, 209 L.Ed.2d 433 (2021), yet even on its own terms I am unpersuaded by the amicus's warnings. The legislative history of the VPPA contravenes amicus's narrative and quiets the sound of its alarm. That's for two reasons.

*First*, Congress acknowledged the ever-progressing advancement of information technology when it initially passed the VPPA and intended the VPPA's protections to continue with those advances. *See* S. Rep. No. 100-599, at 6–7. Rather than designing a statute for a bygone era, Congress recognized that the "computer age" would bring "technological innovations" with "the ability to be more intrusive than ever before." *See id.* at 6. And while it may not have anticipated all those innovations precisely—like the growth of targeted advertising on which amicus focuses—the VPPA was meant to protect consumers' privacy in the face of those advances, not become obsolete. *See id.* at 6–8. Based on the legislative history, then, the amicus is wrong in saying that Congress did not mean for the VPPA to apply in the internet era.

*Second*, in 2013, Congress specifically amended the VPPA, recognizing that the internet had "revolutionized" how Americans watch video content and "share information." S. Rep. No. 112-258, at 2 (2012); Video Privacy Protection Act Amendments Act of 2012, sec. 2, § 2710(b)(2), 126 Stat. 2414 (2013). Specifically, Congress wanted to enable "consumers to share information about their video preferences through social media sites on an ongoing basis," but that wasn't possible because the original VPPA required consent for each disclosure. *See* S. Rep. No. 112-258, at 2–3. Congress amended the VPPA so it now provides that a consumer can give "informed, written consent (including through an electronic means using the Internet)" for a video tape service provider to share their information on an ongoing basis. 18 U.S.C. § 2710(b)(2)(B). Far from the doomsday scenario amicus predicts, video tape service providers need only receive the consumer's consent to disclose data, and they can carry on. Many websites already ask for various forms of consent. Hana Habib, et al., *"Okay, Whatever": An Evaluation of Cookie Consent Interfaces* 1, CHI '22: Conf. on Hum. Factors in Computing Sys. (2022), https://perma.cc/DNZ9-X67N. Therefore, I can't say that "the plain language of the statute would lead to patently absurd consequences that Congress could not possibly have intended." *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 470, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring) (cleaned up).

***13** Given the VPPA's "text, structure, and purpose," I—like the Second and Seventh Circuits—do not read the statute's definition of "consumer" to be limited to subscribers of "*audiovisual* 'goods or services.' " *NBA*, 118 F.4th at 537; *see also Gardner*, ––– F.4th at ––––, 2025 WL 942835, at *2. I therefore respectfully part ways with the majority opinion in interpreting what constitutes "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).[4]

4 Because I would conclude that Salazar is a consumer based on the plain meaning of "goods or services from a video tape service provider," I do not reach the question of whether the newsletter is "audiovisual" in nature. Both the majority and the district court conclude that Salazar did not sufficiently allege that the newsletter is audiovisual primarily because he did not allege that he "accessed videos through the newsletter." Maj. Op. at ––––; *see also* Op. & Order, R. 33, PageID 286. This is curious reasoning. For example, if a person purchases a video cassette tape or DVD but does not actually watch the movie, does it cease to be an audiovisual good? I doubt it. Even so, all that is required to remedy this problem is for Salazar or another plaintiff to allege that he clicked on the link. I would hesitate to adopt a definition of audiovisual material that turns on a click.
The district court did not address whether Salazar should be granted leave to amend his complaint to further allege that the newsletter is audiovisual material—perhaps because Salazar

only mentioned amending in a footnote. And the majority concludes that Salazar's failure to move more substantively for leave to amend precludes his asking for it now. Fair enough. Doubtless, that will be the next case.

## CONCLUSION

Because Salazar has stated a claim for relief under the plain text of the VPPA, I respectfully dissent.

**All Citations**

--- F.4th ----, 2025 WL 1000139

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.